755 So.2d 283 (1999)
Wesley E. ABNEY, Alvin W. Abney, Dominick A. Gulizo, Jr. and Dianne Ernest
v.
EXXON CORPORATION, J.E. Merit Constructors, Inc., Inco Alloys International, Inc., Charles E. Shauffer, Dale Chatelain, and Kenny Chatelain.
No. 98 CA 0911.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
Writ Denied January 14, 2000.
*285 J. Chandler Loupe, Edward J. Walters, Baton Rouge, Counsel for Plaintiffs/Appellees Wesley E. Abney, Alvin Abney, Dominick Gulizo, Jr., and Dianne Ernest.
Boris F. Navratil, Baton Rouge, Counsel for Defendants/Appellants J.E. Merit Constructors, Inc.
Before: SHORTESS, FOIL, GONZALES, KUHN, and WEIMER, JJ.
WEIMER, J.
This appeal involves claims made by four former employees of defendant, J.E. Merit Contractors, Inc. ("Merit").[1] The plaintiffs were Wesley Abney (now deceased), Alvin Abney (Wesley's son), Dominick Gulizo, and Dianne Ernest. All were employed as welders for Merit at the Exxon Chemical Company plant in Baton Rouge, Louisiana. At the refinery, they were assigned to weld sheets of stainless steel to the inside surface of a fractionation tower[2] in the Exxon plant using IncoWeld welding rods. During the work in the fractionation tower they were exposed to known human carcinogens. They became ill and eventually were either transferred or quit work because of the working conditions on that particular job.
The trial court awarded damages finding Merit committed an intentional act[3] which prevented defendant from being immune from tort liability under the Louisiana Workers' Compensation Act. The judgment being appealed itemizes special and general damages, as well as punitive damages.
Defendant Merit perfected this appeal. We vacate the awards for future medical expenses, but otherwise affirm.

FACTS
The two Abneys, Mr. Gulizo, and Ms. Ernest were hired by Merit to perform welding and gouging on the walls of the fractionation tower. All four started work inside the fractionation tower. Ms. Ernest, who started work at an earlier date than the three men, complained and was transferred out of the fractionation tower after one week. The three men worked 10-hour shifts, side by side on the lowest level of the multi-level tower for about three weeks before they completed the work and were transferred to the cycle drum oil accumulator.[4] Wesley Abney and Mr. Gulizo worked for Merit for approximately four weeks total before quitting. Alvin Abney quit several days before his father quit.
The plaintiffs' theory is that they became ill because poor ventilation in the fractionation tower and lack of proper *286 safety equipment required that, in order to perform their job duties, they be exposed to and inhale hazardous substances. The defendant admits that the work area was a "confined space," but maintains ventilation as provided by fans was adequate and dust masks, of the type introduced into evidence,[5] were made available to the welders. The parties dispute whether there was an adequate supply of dust masks and whether they were readily available to the welders.
Mr. Gulizo described the conditions in the tower as follows:
You'd go in on the second level in the vessel we were in, drop down to the pan in the bottom, take a ladder up to the center. The scaffolds weren't open like Mr. [Kenny] Chatelain [the Merit supervisor] alleges. These scaffolds were closed in completely. You could walk from one side of the vessel to the other side because they had pipe in this vessel. They had a manifold in this vessel that we were working on from side to side that we had to get to. The scaffold was covered completely with fire blankets so this inconel or whatever substance would drop wouldn't drip on anybody that was under you. The sides of the vessel were closed in completely with fire blankets to stem off any circulation of any air or ventilation at all. He's saying there were six air movers on this vessel, whether coppus blowers or air horns. They wasn't on the vessel I was working on.
It is undisputed that all four welders were using an IncoWeld rod, a type of welding rod which was new to them. They were not provided with the Material Safety Data Sheet (MSDS) for the welding rod until plaintiffs took the deposition of Richard Oliver, site manager for Merit and the company's designated representative. The MSDS was introduced into evidence. It lists specific hazardous ingredients and exposure limits for hazardous reaction products that might be formed by welding and high temperature cutting. The MSDS lists symptoms of short term exposure to dust, welding fume, and gases, as: metallic taste, nausea, tightness of chest, fever, and irritation of eyes, nose, throat and skin. The MSDS also warns that fumes and gases from welding and high temperature cutting cannot be classified simply. The warning continues:
The composition and quantity of both depend on the metal being welded, the process, procedures, and electrodes used. The constituents of the fume are generally different from the ingredients... and may include oxides and mixed oxides of the metals, chromates, and fluorides. The gases may include carbon monoxide, ozone, and oxides of nitrogen. Chlorinated solvents may be decomposed by the arc into toxic gases such as phosgene.
"Special Protection Information" on the MSDS calls for the use of air-supplied respirators in confined spaces, which the defendant admits were not provided to the welders. Concerning ventilation, the MSDS warns that exposures are to be maintained below the specified limits, and that "[c]onfined spaces require special attention to provision of adequate ventilation."
It is also undisputed that there was some crude oil residue in the tower, which in the initial stages of the project, gave off substantial smoke. Mr. Gulizo testified the welders were required to do "gouging" on the walls of the vessel. He described the effect of this procedure as producing smoke which looked like the welders were burning tires.
At a safety meeting held by Merit on February 21, 1989, approximately two weeks after they started work, the Abneys and Mr. Gulizo reiterated complaints they had previously made to their supervisor of having experienced physical symptoms, *287 principally nose bleeds, which they attributed to the smoky conditions in the fractionation tower. Other welders at the safety meeting raised their hands when asked if they were experiencing similar problems, such as nose bleeds. Despite this safety meeting, Mr. Oliver, who was the highest ranking Merit supervisor on the site, said he did not know of the problem until March 6, 1989, when the men quit.
Mr. Gulizo stated that soon after he began working in the fractionation tower on February 6, 1989, he started experiencing nosebleeds, blurry vision, and night sweats and was even throwing up blood. The testimony of the other plaintiffs essentially mirrors that of Mr. Gulizo concerning the physical symptoms each experienced, with the addition of "heavy" feelings in the chest and difficulty breathing, as well as light headedness. Ms. Ernest, who spent the least number of days working in the fractionation tower, experienced fewer symptoms than the men did.

INTENTIONAL ACT
In its first assignment of error, Merit urges the trial judge erred in apparently concluding the evidence is sufficient to establish an intentional act so as to trigger the intentional act exemption from tort liability provided in the Louisiana Workers' Compensation Act. For the following reasons, we find this assignment of error to be without merit.
The question of whether an employer committed an intentional act under the intentional act exception to the Workers' Compensation Act (the "Act") was considered recently by the Louisiana Supreme Court in Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208. In that case the employer directed an employee to move a sandblasting pot manually, a procedure which was prohibited by OSHA and which the employee's supervisor feared would eventually lead to injury. The court held the conduct complained of did not amount to an intentional act, and the plaintiffs remedy was limited to workers' compensation benefits.
In Reeves, the court outlined the history of workers' compensation in this state. From 1914 until 1976, employees were free to pursue tort remedies for work related injuries against executive officers and co-employees. In 1976, the legislature amended the Act in two important respects. It provided that workers' compensation shall be the exclusive remedy against not only the employer, but also against any principal, officer, director, stockholder, partner or employee of the employer or principal who was engaged at the time of the injury in the normal course and scope of his employment. It also provided that the employee is not limited to workers' compensation and may pursue any other remedy where this compensable injury results from an intentional act.
As amended in 1976, LSA-R.S. 23:1032(B) reads:
Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
As the court pointed out in Reeves, the legislature, in considering the 1976 amendment, used the words "intentional act" and rejected the following terminology offered for inclusion in the proposed legislation: "an intentional or deliberate act"; "violation of a recognized safety rule or regulation,... failure to provide a safety device required by a recognized safety rule or regulation or by a statute, or by gross negligence on the part of a supervisory employee"; and "gross negligence" (meaning "such disregard of the interest of others that the tortfeasor's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonable careful man under like circumstances"). Reeves, 98-1795 at 2, 731 So.2d at 209.
*288 The court explained that the meaning of "intent" in the context of the amended statute was that the employer or other person identified in the Act must either (1) consciously desire the physical result of his act, whatever the likelihood of the result happening from his conduct, or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Reeves, 98-1795 at 3, 731 So.2d at 209-210. Citing Bazley v. Tortorich, 397 So.2d 475, 480 (La.1981) and a long list of subsequent cases, the Louisiana Supreme Court noted that it and the appellate courts have narrowly construed the intentional act exception according to the legislative intent. Reeves, 98-1795 at 4, 731 So.2d at 210. Likewise, in Reeves, the court narrowly construed the intentional act exception. Although OSHA guidelines prohibited the sandblasting pot from being moved manually and although the supervisor had requested a forklift, the fact he nevertheless ordered the pot moved manually did not establish an intentional act.
Because of the narrow construction of the statute, the cases holding the employer's acts do not amount to intentional acts far outnumber the cases holding the employer's act is intentional so as to trigger the application of the intentional act exception.
We note "substantial certainty" requires more than a reasonable probability. The injury must be inevitable; the injury causing event must be incapable of failing. A high probability of someone getting hurt is not enough. The exception is designed for acts which are intentional, not for acts which are wanton or reckless or careless or grossly negligent. The violation of safety standards, without more, is generally not sufficient. See Reeves, supra, and Williams v. Gervais F. Favrot Co., Inc., 573 So.2d 533, 541 (La.App. 4 Cir.), writ denied, 576 So.2d 49 (1991).
A distinguishing feature in determining whether the conduct complained of meets the "substantial certainty" test is whether the event has occurred before or whether the injury has manifested itself before. In Reeves, the eventmoving the pot manuallyhad occurred before, without injury. Therefore, the injury was not substantially certain to result from again moving the pot manually. Reeves, 98-1795 at 4, 731 So.2d at 210. However, in Wain-wright v. Moreno's Inc., 602 So.2d 734, 739 (La.App. 3 Cir.1992), the employer committed an intentional act by ordering the employee to work in a ditch that had caved in the previous day and which appeared as though it would cave in again. Likewise, in Trahan v. Trans-Louisiana Gas Company, Inc., 618 So.2d 30, 31 (La.App. 3 Cir.1993), the plaintiff correctly alleged the employer committed an intentional act by repeatedly exposing the employee to the chemical mercaptan where the employee had become ill on two prior occasions after exposure to mercaptan.
Although Trahan was not a decision on the merits, but merely a reversal of the trial court's decision sustaining a no cause of action exception, the factual situation closely resembles the situation in the instant case. We note the Louisiana Supreme Court cited Trahan with approval in Reeves.
We must distinguish the case of Casto v. Fred's Painting, Inc. 96-405 (La.App. 5 Cir. 1/15/97), 688 So.2d 72, reversed, 97-0374 (La.4/4/97), 692 So.2d 408, which involved an injury that occurred when an employee touched a refrigerator handle and suffered an electrical shock. Evidence showed persons had been shocked when touching the handle numerous times, but the employer had attempted to remedy the situation by insulating the handle. Because the Louisiana Supreme Court reversed the finding of an intentional act without reasons, we have little insight into the rationale of the reversal.
Our reading of the appellate court opinion convinces us that the remedial measures attempted by the employer negated any intent on its part that an injury *289 would occur. Thus, the Supreme Court's reversal of the finding of an intentional act in Casto is clearly inapplicable in light of the facts presently before us. When an employer repeatedly sends employees back to work without safety equipment or without remedial measures being taken, and the employees are inevitably injured each time they are sent back to work, then the employer can be considered to have committed an intentional act. See Trahan, 618 So.2d at 32.
The testimony here was that every time the welders worked in the fractionation tower, they inevitably suffered nose bleeds and other symptoms. Implicit in the trial court's ruling is a finding that the court believed the testimony that every time the employees went into the tower they suffered nose bleeds and other symptoms, and that they informed Merit supervisory personnel of the problems they encountered. Thus, the trial court implicitly rejected the defendant's evidence which indicated the company did not know of these problems until much later; that the supervisors inspected the tower and found the ventilation sufficient; that the dust masks were adequate protection, and that there were enough dust masks provided. Our review of these findings by the trial court is subject to the manifest error rule.
The Louisiana Supreme Court developed a two part test for reviewing factual issues on appeal in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). According to the test, appellate courts may not disturb a trier of fact's factual findings unless:
1. The appellate court finds from the record that a reasonable factual basis for the finding of the trial court does not exist, and
2. The appellate court determines that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
The court has promulgated some general principles for appellate courts to follow when determining whether factual findings are "clearly wrong." One general principle concerns the credibility of witnesses. When factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Credibility determinations may be clearly wrong when "documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story." Rosell, 549 So.2d at 844-845; Stobart, 617 So.2d at 882. However, absent contradictory evidence or inconsistent or implausible statements, it is "virtually never" clearly wrong for the fact finder to accept one witness's version of the facts over another. Rosell, 549 So.2d at 845.
The trial court's factual findings in the present case are based on credibility determinations and must be afforded great deference. After reviewing the record in its entirety, we conclude the trial judge was not manifestly erroneous and thus did not err in determining defendant's conduct amounted to an intentional act.
As we have previously mentioned, Merit supervisors denied the plaintiffs made complaints prior to the safety meeting on February 21, 1989. After the defense rested at the trial on the merits, the plaintiffs, Mr. Abney and Mr. Guilizo were recalled in rebuttal. Mr. Abney emphatically stated he had complained to two supervisors with Merit, Mike Vampran and Kenny Chatelain, and was told they could not have fresh air respirators because it would take too long to teach the welders to use them. Mr. Abney stated they had the choice of going back into the hazardous *290 conditions in the tower or quitting the job.
The above are disputed facts, and the defendant has failed to show the trial court committed manifest error in this matter. Although the standards of proof of an intentional act are strict, we believe the plaintiffs showed that every time they went into the tower they inevitably suffered health problems, they complained but were not provided with safety equipment to alleviate the inevitable health problems, and they were ordered to return to work. Thus, they have proved an intentional act. With this support for the trial court's findings in the record, we cannot say the trial court committed manifest error.

MEDICAL MONITORING
On appeal, the defendant challenges the propriety of the trial court's awards to the three surviving plaintiffs for future medical expenses. We agree that the record does not support such an award.
At the time of trial, the three surviving plaintiffs were asymptomatic, as were the plaintiffs in the recent case of Bourgeois v. A.P. Green Industries, Inc., 97-3188 (La.7/8/98), 716 So.2d 355. The Louisiana Supreme Court considered the "narrow issue" of whether asymptomatic plaintiffs, who had had significant occupational exposure to asbestos and must bear the expense of periodic medical examinations to monitor the effects of that exposure had suffered "damage" under LSA-C.C. art. 2315. After considering the law of Louisiana and other states, the court concluded the reasonable cost of medical monitoring is a compensable item of damages under Article 2315.[6] However, the court imposed a stringent list of criteria for the plaintiff to satisfy, by competent expert testimony, as follows:
(1) Significant exposure to a proven hazardous substance.
(2) As a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.
(3) Plaintiffs risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease.
(4) A monitoring procedure exists that makes the early detection of the disease possible.
(5) The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles.
(6) The prescribed monitoring regime is different from that normally recommended in the absence of exposure.
(7) There is some demonstrated clinical value in the early detection and diagnosis of the disease.
Bourgeois, 97-3188 at 8-11, 716 So.2d at 360-361.
Conceding for the sake of discussion that the record shows the plaintiffs were victims of a "substantial exposure" as required by the first factor listed in Bourgeois, nevertheless, other factors are wholly unsatisfied by the plaintiffs' evidence. Our review of the present matter in light of the above-listed factors indicates that a reversal of the awards for future medical expenses is necessary.
Arguing that the awards for future medical expenses were warranted, plaintiffs rely on the testimony of Dr. Richard W. *291 Kearney, who is board certified in pulmonary medicine. Dr. Kearney was questioned about the substances contained in the welding rods identified as possible carcinogens in the MSDS. His response was that there was an unknown potential for possible malignancy which could not be quantified at the present time. He stated that other than for lung cancer, he would defer to an oncologist. When Dr. Kearney was pressed to quantify plaintiffs' increased risk of contracting cancer, he stated he thought it was no more than a seven percent increase over the base line for lung cancer. However, he was of the opinion that a monitoring procedure for lung cancer is ineffective because by the time it is detectable, it is already beyond control.
Dr. Kearney's testimony specifically negates proof of several factors listed in Bourgeois. Thus, the expert medical testimony in the instant case fails short of proving the Bourgeois factors.
Accordingly, we vacate the trial court's awards for future medical expenses.

PUNITIVE DAMAGES[7]
The defendant's third assignment of error asserts the trial court erred in awarding punitive damages pursuant to LSA-C.C. art. 2315.3 (now repealed).[8] In briefing that assignment, Merit raises two issues: whether punitive damages are now barred by the recent case of Adams v. J.E. Merit Construction, Inc., 97-2005 (La.5/19/98), 712 So.2d 88; and whether the evidence concerning the toxicity or concentrations of substances is sufficient to fall within the ambit of former Article 2315.3.
As previously mentioned, the Louisiana Supreme Court in Adams reversed Billiot v. B.P. Oil Company, 93-1118 (La.9/29/94), 645 So.2d 604. Adams held that an employee cannot recover punitive damages pursuant to LSA-C.C. art. 2315.3 from an employer who is shielded by the tort immunity provided in the Louisiana Workers' Compensation Act. The court in Adams specifically stated that it was not addressing "whether plaintiffs, if successful in proving an intentional act under LSA-R.S. 23:1032, would then be eligible to recover punitive damages under former Article 2315.3." Adams, 97-2005 at 12, 712 So.2d at 94, n. 5.
The language of LSA-R.S. 23:1032(B), previously quoted, clearly allows exemplary damages as contemplated by Article 2315.3 once an intentional act is proven. Paraphrasing LSA-R.S. 23:1032, an employer is liable for a "fine or penalty under any other statute," civil or criminal, resulting from an intentional act.
In 1989, when the plaintiffs were exposed to the hazardous substances, LSA-C.C. art. 2315.3 provided a "penalty," in the form of exemplary damages, that could be imposed on an employer pursuant to LSA-R.S. 23:1032(B). Thus, once an intentional act is established, the plaintiff is entitled to exemplary damages as provided by law if sufficiently proven.
There is no merit to defendant's argument in the instant case that Adams bars the plaintiffs' recovery of punitive damages.
Finally, the defendant argues the evidence of toxicity or concentrations of substances is insufficient to support the trial court's award of punitive damages pursuant to LSA-C.C. art. 2315.3. The MSDS entered into evidence provides a list of "hazardous ingredients" contained in the welding rods as well as warnings concerning the fumes and gases produced *292 during welding with the rods. This document, issued by the manufacturer of the welding rods, when coupled with the testimony of the plaintiffs and their witnesses concerning the conditions in the fractionation tower, sufficiently supports the trial court's decision that the plaintiffs suffered injury from hazardous substances so as to be entitled to exemplary damages. We cannot say the trial court committed manifest error in this finding.
We note other issues related to the applicability of LSA-C.C. art. 2315.3 were neither raised nor briefed by the defendants. Matters neither assigned as error nor argued, or matters assigned as error but not argued may be considered abandoned. See Uniform RulesCourt of Appeal 2-12.4; Doucet v. Champagne, 94-1631 (La.App. 1 Cir. 4/7/95), 657 So.2d 92, amended on rehearing, 94-1631, p. 1 (6/21/95), 657 So.2d 92, 100, writs denied, 95-1887 (11/3/95), 661 So.2d 1379, cert. denied, 517 U.S. 1120, 116 S.Ct. 1353, 134 L.Ed.2d 522 (1996). Accordingly, we decline to address any issues not raised.
In conclusion, having found merit in one of defendant's assignments of error, we vacate the awards for future medical expenses. In all other respects, we affirm. We assess the defendant, Merit, with costs of this appeal.
AFFIRMED IN PART; JUDGMENT VACATED IN PART.
SHORTESS, J., dissents with reasons.
KUHN, J., concurs in part, dissents in part, and assigns reasons.
SHORTESS, J., Dissenting.
"I don't think anybody deliberately put us in a bad situation.... But as far as one of the foremen or supervisors saying, `You get back in that hole and work,' no, I was never told this.... [T]hey was doing anything and everything they could to correct the situation" So testified plaintiff Wesley E. Abney.
Four of the thirty or so Merit employees, including Wesley Abney, who worked in Exxon's fractionation tower and cycle oil drum accumulator, filed suit contending that they suffered health problems every time they went into an enclosed area to weld, that Merit failed to provide them with proper safety equipment, that Merit ordered them to go back to work despite their health problems, and that this conduct amounted to an intentional tort. The majority finds the trial court must have believed the plaintiffs' testimony and not defendants' witnesses and their testimony was sufficient to prove an intentional tort, i.e., they proved that Merit's supervisors knew without a doubt that these plaintiffs would become ill from working and did nothing.
In my opinion, this result ignores the plaintiffs' own testimony that Merit did attempt, albeit unsuccessfully, to correct the problems. When plaintiff Dianne Ernest complained about a bad odor in the tank, Exxon sent someone to check it out, provided her with three different kinds of respirators, and then moved her to a better ventilated area. When plaintiff Dominick Gulizo went to the Merit tool room and asked for a respirator, he was given one. And Wesley Abney testified in his deposition that, in his opinion, Merit's supervisor had "done everything ... they could have done" about the ventilation problem.
To commit an intentional tort against its employees, an employer must know without a doubt that they will be injured and yet fail to do anything to prevent it. The cases are legion in Louisiana that failure to provide a safety device or gross negligence or carelessness or recklessness is not sufficient. In Casto v. Fred's Painting,[1] an employer made an unsuccessful attempt to correct a hazard which caused its employees to be shocked when they touched a refrigerator used by the employees. An employee who was shocked sued the employer, claiming intentional tort. *293 The Louisiana Supreme Court summarily reversed a finding in plaintiffs favor, even though each and every time an employee touched the refrigerator, he was shocked. The majority attempts to distinguish this case by stating the unsuccessful remedial measure attempted by Fred's Painting negated any intent on its part. What about the remedial measures attempted by Merit? Even if the trial court disbelieved every word of testimony by defendants' witnesses, even plaintiffs testified to some type of remedial measures.
In my opinion, the evidence is insufficient to meet the strict standards required to prove an intentional tort. I respectfully dissent.
KUHN, Judge, concurring in part and dissenting in part.
I concur with the result reached by the majority in its conclusion that plaintiffs proved an intentional act. I dissent, however, from the majority's conclusion that, under the facts of this case, the trial court erred in awarding plaintiffs the reasonable future medical expenses in the form of costs of medical monitoring.
Dr. Kearney testified that there was physical injury to the plaintiffs and, based on that injury, he would monitor the plaintiffs yearly. The majority states that such monitoring would be worthless and suggests that once cancer were discovered "it is already beyond control," i.e., that it would be too late. Everyday experiences in medical treatment tells us that prophylactic treatment of potential or current cancer patients is appropriate and necessary, and may well result in extension of the lives of some cancer patients.
The trial court, in fact, made awards for "future medical expenses" rather than "medical monitoring expenses" as the majority states. Based on Dr. Kearney's testimony, I believe a reasonable factual basis exists to support the awards of future medical expenses. As such, the trial court's determination that these plaintiffs were entitled to the awards is not manifestly erroneous. Although the majority fails to specify the amounts of future medical expenses awarded ($3000.00 each to three of the four plaintiffs), based on my review of the record the quantum of each of these awards certainly cannot be considered to be an abuse of discretion.
NOTES
[1] Other defendants named by plaintiffs were: Exxon Corporation, the company that contracted the project with Merit; Kenny Chatelain and Dale Chatelain, two of Merit's supervisors; and Inco Alloys International, Inc., the manufacturer of the "IncoWeld" welding rods plaintiffs were required to use. Before trial, plaintiffs dismissed their suit against Inco Alloys and Exxon. Thus, trial proceeded solely against Merit and its two supervisors. Only Merit was cast in judgment and is the only defendant before us on appeal.
[2] The 100-foot tall fractionation tower and 30-foot tall cycle oil drum accumulator, to which the plaintiffs were transferred shortly before the end of their employment by Merit, are sometimes referred to as "enclosed vessels" in the testimony and in brief.
[3] The plaintiffs asserted two separate claims at trial: an intentional act by the employer, or in the alternative, that Merit's conduct was wanton and reckless disregard for the safety of employees and called for punitive damages. The alternative claim was based on Billiot v. B.P. Oil Company, 93-1118 (La.9/29/94), 645 So.2d 604. The plaintiffs concede on appeal that since the trial court found Merit's conduct was intentional, the claim based on Billiot is inconsequential. Additionally, we note Billiot has been specifically overruled by Adams v. J.E. Merit Construction, Inc., 97-2005 (La.5/19/98), 712 So.2d 88.
[4] See Note 2, supra. The record reflects that on March 6, 1989, an Exxon hygienist placed monitors on two Merit employees in the cycle oil drum accumulator, but the plaintiffs' complaints concerned conditions in the fractionation tower.
[5] The items entered into evidence cannot be classified as respirators. They are constructed of paper and designed to cover the nose and mouth.
[6] In an effort to be thorough, we note the enactment of Act No. 989 by the 1999 regular session of the Louisiana Legislature. The act amends LSA-C.C. art. 2315 by the addition of the following language pertinent to medical monitoring: "Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease." In light of our reversal of the award for future medical expenses, we are not required to address the applicability of Act 989 to this case.
[7] We note the terms "exemplary damages" and "punitive damages" are often used interchangeably. Black's Law Dictionary, Revised Fourth Edition, pp. 467-468.
[8] Article 2315.3 provided: "In addition to general and special damages, exemplary damages may be awarded, if it is proved that the plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances."
[1] 96-405 (La.App. 5th Cir.1/15/97), 688 So.2d 72.