# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-1417

TOMMIE HEBERT AND MELISSA ANNE HEBERT

VERSUS

J. ORAN RICHARD, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C20081200
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

## J. DAVID PAINTER
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, Marc T. Amy, J. David Painter, and Phyllis M. Keaty, Judges.

**Thibodeaux, Chief Judge, dissents in part and assigns written reasons.**
**Keaty, Judge, dissents in part for the reasons assigned by Chief Judge Thibodeaux.**
**Amy, Judge, concurs in part and dissents in part and assigns written reasons.**

                              **REVERSED IN PART, AFFIRMED
                              IN PART, AND REMANDED.**

Joseph R. Joy, III
P. O. Box 4929
Lafayette, LA 70502
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Melissa Anne Hebert and Tommie Hebert

Kenneth Hugh Laborde
Brendan P. Doherty
701 Poydras Street - Suite 4800
New Orleans, LA 70139-4800
COUNSEL FOR DEFENDANTS/APPELLEES:
    Industrial Helicopters, Inc., Michael David Richard, Allianz Global Risks
    U.S. Insurance Company, Game Management, Inc., and J. Oran Richard

Charles R. Sonnier
P. O. Drawer 700
Abbeville, LA 70511-0700
COUNSEL FOR DEFENDANTS/APPELLEES:
    Industrial Helicopters, Inc., Michael David Richard, Allianz Global Risks
    U.S. Insurance Company, Game Management, Inc., and J. Oran Richard

**PAINTER, Judge.**

Plaintiffs, Tommie Hebert and his wife, Melissa Anne Hebert, appeal the trial court's rulings on motions for summary judgment on the issues of employment status/tort immunity, intentional tort, and spoliation of the evidence. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

### FACTS AND PROCEDURAL HISTORY

In March of 2007, Mr. Hebert sustained multiple injuries when he fell to the ground from a moving helicopter which was owned by his employer, Industrial Helicopters, Inc. (Industrial). Industrial's principal business was aerial herbicide application to power line, pipeline, and drainage canal right of ways to control brush and tree growth. Industrial also supplied helicopters for fish and game surveys, game capture, pipeline patrols and surveys, and photography missions. At the time of the accident, Mr. Hebert was forty-eight years old and had been working for Industrial for twenty-nine years, primarily as a commercial fuel truck driver. He also performed manual labor on the Richards' various properties. Following the accident, Mr. Hebert underwent complex surgeries to his back, right femur, right ankle, and left tibia. He has chronic pain, disabilities, and numbness in his upper extremities. His medication includes a daily morphine patch, and he may require another lumbar surgery.

At the time of the accident, the owner and president of Industrial, J. Oran Richard, also owned Game Management, Inc. (GMI). GMI allegedly leased large tracts of land for hunting, fishing, farming, and ranching in Louisiana and Texas. It also performed wildlife surveys and leased land for deer capturing in Mexico. GMI

1

did not own land, and all of its leases were allegedly verbal. GMI had no employees and no payroll.

The deer capturing activity in Mexico was alleged to be a cash only operation, including all expenses and income. The helicopter, pilot, fuel trucks, drivers, and deer netters were supplied by Industrial. GMI produced no 1099's, invoices, contracts, leases, sales receipts, or evidence of GMI lease payments or other expenses or purchases, and no documents indicating ownership of equipment, or equipment rental. The deer were tracked aerially and were captured by being "shot" from above with a netting gun. The gun resembled a rifle or shotgun with a four-legged tri-pod attached to the barrel and required two-handed operation.

The helicopter used for deer netting was a Bell 206, which was refitted in Mexico for use by GMI. The doors and back seats of the helicopter were removed, and a plywood box was fitted over the back seat area. The person using the netting gun sat on the edge of the plywood, and his legs and upper body hung outside the helicopter. While targeting the deer, the shooter was required to lean out of the helicopter to avoid shooting the net into the rotary blades or the landing skids. For fall protection, he wore a climbing harness clipped to a strip of webbing, or lanyard, which was in turn clipped to the back seatbelts that were left in the helicopter when the back seats were removed. The record contained no written approval or reporting for the restraint system design or the helicopter revisions in Mexico or the United States.

Mr. Hebert was asked by Michael David Richard (Mike Richard), the son of J. Oran Richard, to serve as a deer netter for the weekend that the accident occurred. Mike Richard was the helicopter pilot. He was employed by Industrial and

2

coordinated the deer netting activities allegedly conducted by GMI. Mr. Hebert attempted to decline, but when Mike Richard told Mr. Hebert that another Industrial employee could not go and that he wanted Mr. Hebert there, Mr. Hebert complied. Prior to the accident in 2007, Mr. Hebert had performed as a deer netter on one previous trip to Mexico in 2003.

On the date of the accident, Mr. Hebert leaned out to net a deer, the helicopter banked, and Mr. Hebert fell to the ground. Before the date of Mr. Hebert's accident, another Industrial employee, Luis Cedillo, had fallen from the helicopter while netting deer.

Mr. Hebert weighed between 250 and 270 pounds. When he fell, his feet struck the ground first, and he tumbled or rolled over several times before coming to rest on his side. Having suffered several fractures, he was in significant pain and unable to move. Mike Richard obtained a board to stabilize Mr. Hebert, and with help from a ground crew, put him back in the helicopter and transported him to Fort Dunkin Medical Center in Eagle Pass, Texas. The climbing harness was cut off of Mr. Hebert by hospital personnel in the emergency room.

In his personal injury suit against Defendants, J. Oran Richard, Mike Richard, Industrial, GMI, and Allianz Global Risks U.S. Insurance Co. (Allianz), Mr. Hebert alleged that he was exclusively employed by Industrial and was not in the course and scope of his employment with Industrial when he fell from the helicopter in Mexico. He alleged that the Richards and GMI instructed him to stand outboard a moving aircraft and perform a task they knew to be dangerous and hazardous. He alleged various acts of negligence by the Defendants including negligent entrustment of the helicopter by Industrial, negligent design by GMI of a restraint system, violations of

3

the Louisiana Product Liability Act (LPLA) and the Federal Aviation Act (FAA), and spoliation of evidence.

In the alternative, Mr. Hebert alleged that, if he were found to be in the course and scope of his employment, then Defendants were liable because they knew that his accident was substantially certain to follow, because another Industrial employee, Luis Cedillo, had fallen in the same manner using the same helicopter and harness while netting deer in Mexico.

Defendants filed motions for summary judgment, arguing that they were entitled to the exclusive remedy protections of the Workers' Compensation Act at La.R.S. 23:1032(A),[1] and that Mr. Hebert would not be able to prove intentional tort, at La.R.S. 23:1032(B),[2] the only exception to the Act's exclusivity protection. Defendants also filed a motion for summary judgment on spoliation of evidence, and Mr. Hebert filed a cross-motion on that same issue. The trial court agreed with Defendants and found that Mr. Hebert was netting deer for GMI, a special employer who had "borrowed" him from his general employer, Industrial. Under the borrowed servant doctrine and La.R.S. 23:1031(C),[3] both employers are solidarily liable for workers' compensation benefits and are protected from suit in tort.

---

[1]In pertinent part, La.R.S. 23:1032 provides: "A.(1)(a) Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages . . . .

[2]"Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act." La.R.S. 23:1032(B).

[3]In pertinent part, La.R.S. 23:1031(C) provides: "In the case of any employee for whose injury or death payments are due and who is, at the time of the injury, employed by a borrowing employer in this Section referred to as a "special employer," and is under the control and direction of the special employer in the performance of the work, both the special employer and the immediate employer, referred to in this Section as a "general employer," shall be liable jointly and in solido to pay benefits as provided under this Chapter. . . . The special and the general employers shall be entitled to the exclusive remedy protections provided in R.S. 23:1032."

4

In addition to granting Defendants' motions for summary judgment on the employment status/tort immunity issue and on the issue of intentional tort, the trial court granted Defendants' motions for summary judgment on the issue of spoliation of evidence and denied Mr. Hebert's cross-motion on same. Mr. Hebert appeals the trial court's judgment on all three issues.

**DISCUSSION**

*Summary Judgment*

Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342, 345 (La.1991). After adequate discovery or after a case is set for trial, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966.

*Employment Status/Tort Immunity*

The trial court found that Mr. Hebert was the general employee of Industrial and the borrowed special employee of GMI at the time of the accident rendering both defendants solidarily liable for workers' compensation benefits but immune from liability for tort negligence. The trial court relied on *Perry v. Perry & Sons Vault and Grave Servs., Inc.*, 03-1519 (La.App. 3 Cir. 5/12/04), 872 So.2d 611, and *Humphreys v. Marquette Cas. Co.*, 235 La. 355, 103 So.2d 895 (La.1958), two workers' compensation cases, neither of which involved a suit in tort.

Mr. Hebert contends that the court's reliance on *Perry* and *Humphreys* was in error. We agree. Each of those cases involved the issue of which of two workers' compensation insurers was liable for the claimant's benefits, the carrier for the original employer, or the carrier for the borrowing employer at the time of the accident. In each case, both the lending employer and the borrowing employer and their separate workers' compensation insurers were found solidarily liable for workers' compensation benefits. In the present case, only Industrial carried workers' compensation insurance. Its carrier, Louisiana Workers' Compensation Corporation (LWCC), is not a party to this suit. This suit was not brought "for purposes of entitlement to workers' compensation benefits," a distinction the *Perry* court made in giving weight to the cases cited therein. *Perry*, 872 So.2d at 616.

When a petition asserts a personal injury cause of action in tort, the existence of a workers' compensation bar to the tort action is an affirmative defense with the burden of proof on the employer. *Mundy v. Dep't of Health and Human Res.*, 593 So.2d 346 (La.1992). Material issues of fact as to whether an injury occurs *in* the course and scope of employment and arises out of employment preclude summary judgment in favor of the employer. *See Wells v. Higginbotham*, 43,472 (La.App. 2 Cir. 8/13/08), 989 So.2d 848, *writ denied*, 08-2425 (La. 12/12/08), 996 So.2d 1121. "The two requirements cannot be considered in isolation from each other. La.R.S. 23:1031; *Guillory v. Interstate Gas Station*, 94-1767 (La. 03/30/95), 653 So.2d 1152." *Wells,* 989 So.2d at 850.

The supreme court in *Mundy* recognized the "mutual interdependence of the two concepts" and the necessity of analyzing both in determining the relationship of the injury to the employment. The court explained that "[a]n accident occurs in the

6

course of employment when the employee sustains an injury while actively engaged in the performance of his duties during working hours, either on the employer's premises or at other places where employment activities take the employee." Mundy, 593 So.2d at 349. The court further explained that "[t]he determination of whether an accident arises out of employment focuses on the character or source of the risk which gives rise to the injury and on the relationship of the risk to the nature of the employment. An accident arises out of employment if the risk from which the injury resulted was greater for the employee than for a person not engaged in the employment." *Mundy*, 593 So.2d at 349 (citations omitted).

Here, the record indicates that Mr. Hebert was not employed as a deer netter for Industrial or GMI. In almost thirty years of employment, he had performed that function on only one prior trip to Mexico, four years before this incident. The trial court performed no direct analysis of course and scope or the additional and necessary concept of La.R.S. 23:1032 "arising out of employment." These concepts are the cornerstone of Plaintiffs' case, and there are numerous fact issues regarding them. Mr. Hebert did not deny doing work on properties allegedly leased by GMI, but he was always paid by Industrial. He denies being paid for the deer netting with GMI. In order for an employer-employee relationship to exist, there must be an implied or expressed contract of employment "whereby services are furnished in anticipation of compensation." *Perry*, 872 So.2d at 615 (quoting *Deville v. Pugh*, 490 So.2d 800, 802 (La.App. 3 Cir. 1986)). Mr. Hebert asserts that he was not paid and had no expectation of being paid for the deer netting. Wayne Gremillion, who replaced Mr. Hebert the day after the accident, testified that he was not paid for the deer netting.

7

Neither Industrial nor GMI produced documentation to prove that Tommie Hebert or anyone else was ever paid by any entity to do deer netting in Mexico.

Mike Richard's deposition testimony indicated that he thought Mr. Hebert received a $300.00 "tip" for the deer netting in Mexico, but that he did not pay Mr. Hebert. Mike Richard testified that he gave all the cash from the Mexico operation to his father. He also testified that he had not coordinated another GMI deer netting activity in Mexico since Mr. Hebert's accident. However, the trial court found no issue of material fact regarding the nature of Mr. Hebert's employment duties with Industrial or GMI for the almost thirty years that he worked for Industrial prior to the accident. We strongly disagree with that conclusion.

*Wells*, 989 So.2d at 851, involved an employee's attack by a co-worker. In that case, the appellate court reversed the trial court's granting of the employer's motion for summary judgment, stating: "The petition in this case asserts a personal injury cause of action. The employer presented nothing to show that this injury arose out of plaintiff's employment and that plaintiff's exclusive remedy was under workers' compensation."

In determining whether an accident arises out of employment, it is necessary to consider: (1) whether the employee was engaged about his employer's business; and (2) whether the conditions of the obligations of the employment caused the employee to be at the place of the accident at the time the accident occurred. *See Hudson v. Progressive Sec. Ins. Co.*, 05-2648 (La.App. 1 Cir.11/3/06), 950 So.2d 817. "In determining whether an issue is genuine, courts cannot consider the merits, make credibility determinations, evaluate testimony, or weigh evidence." *Id.* (quoting *Haydel v. State Farm Ins.*, 05-701 (La.App. 1 Cir. 3/24/06), 934 So.2d 726, 728)).

8

Our courts regularly hold that material issues of fact regarding the scope of employment in tort suits preclude summary judgment on tort immunity in favor of the employer. *See Prejean v. Maint. Enters., Inc.*, 08-364 (La.App. 4 Cir. 3/25/09), 8 So.3d 766, *writ denied*, 09-892 (La. 6/26/09), 11 So.3d 496; *Vaughn v. BFI Waste Sys. of N. A., Inc.*, 01-1105 (La.App. 4 Cir. 7/25/01), 793 So.2d 410; *and, see Lavier v. Maclellan*, 247 So.2d 921 (La.App. 4 Cir. 1971).

Defendants admit that Mr. Hebert was not in the course and scope of his employment with Industrial when he fell from the helicopter. Yet, when Mr. Hebert was admitted to the hospital in Texas by Mike Richard, the admitting form stated that his injury was work-related and that his employer was Industrial. Defendants assert that Mr. Hebert was in the course and scope of employment with GMI, but there is no documentation to support what the business of GMI actually was, or that Mr. Hebert was paid for GMI work.

Mr. Hebert's third set of discovery requested specific documentation on course and scope and borrowed servant issues. Defendants objected and produced no leases, W-2's, 1099's, no documents reflecting lease payments, GMI loans, tax returns, deer netting income, expenses, tips, payments to employees or contractors, no GMI time sheets, or helicopter rentals. The absence of these creates numerous issues of material fact. Most of the requests were limited to a five-year period. Since Mr. Hebert had not done deer netting for four years, and because that is when the activity first began, the five-year period was not overly broad. The information denied to Mr. Hebert and deemed irrelevant by the trial court is the information that Defendants should have produced to prove their entitlement to summary judgment on the borrowed servant and tort immunity issue as discussed below.

9

In the legal determination of whether an employee has been borrowed from his original employer by a borrowing employer, the court considers:

> (1) First and foremost, who has the right of control over the employee beyond mere suggestion of details or cooperation; (2) who selected the employee; (3) who paid the employee's wages; (4) who had the right to fire the employee; (5) who furnished the tools and the place to perform the work; (6) whether the new employment was over a considerable length of time; (7) whose work was being done at the time of the accident; (8) whether there was an agreement between the borrowing and lending employers; (9) whether the employee acquiesced in the new work situation; and (10) whether the original employer terminated his relationship with or relinquished his control over the employee.

*Green v. Popeye's Inc.*, 619 So.2d 69, 73 (La.App. 3 Cir. 1993), (quoting *Billeaud v. Poleodore*, 603 So.2d 754 (La.App. 1 Cir.), *writ denied*, 608 So.2d 176 (La.1992)). None of these factors alone is determinative, but the totality of the circumstances must be considered. *See Harrington v. Hebert*, 00-1548 (La.App. 3 Cir. 5/23/01), 789 So.2d 649. Mr. Hebert contends that all of the above factors create issues which preclude summary judgment. We agree.

*Borrowed Servants*

The right of control is in dispute because Mike Richard, a paid employee of Industrial, coordinated the deer netting activity. It is disputed whether Mike Richard was acting on behalf of GMI or Industrial. The only evidence of a fuel purchase showed that an Industrial credit card was used. Mr. Hebert attested to the fact that in times past and on the subject trip to Mexico he drove a fuel truck from Lafayette to Del Rio, Texas, purchasing fuel and a hotel room with an Industrial credit card. The only fuel receipt produced was charged on an Industrial credit card.

Neil Gremillion testified that he worked part-time for Industrial and Mike Richard netting deer in Mexico. He did other jobs for Industrial and was always paid with Industrial checks. He testified that he either drove or flew to Mexico with Mike

10

Richard, who was always the Industrial pilot for the deer netting trips. Mr. Gremillion further testified that Industrial provided two fuel trucks for the deer netting in Mexico and that he himself had driven Industrial fuel trucks to Mexico. Neil Gremillion is the son of Wayne Gremillion, who worked full time managing one of the Richards' leased properties known as Goose Lake.

The issues surrounding Mike Richard's employment with Industrial create issues of fact regarding the other factors including Mr. Richard's selection of Mr. Hebert for the subject trip to Mexico when Neil Gremillion could not go. Likewise, there is an issue of fact regarding whether Mike Richard had a right to fire Mr. Hebert when both men were employed and paid by Industrial. The actual payment of wages for deer netting activities is undocumented and in dispute. Mr. Hebert and Wayne Gremillion testified that they were not paid for deer netting. Defendants imply that the employees were paid "tips." The record reveals, however, that tips paid to employees were from hunting or fishing clients and that the aerial deer netting in Mexico was not a commercial enterprise open to hunters or fishermen according to the testimony of J. Oran Richard.

Regarding the tools, equipment, and location used, the Richards testified that the netting gun and harness system were provided by GMI. However, GMI did not produce any receipts or proof of purchase for either. Paul Marks testified that he purchased the climbing harness from Guidry Hardware in Scott, Louisiana, between 1995 and 1998 for his work on communication towers. He testified that he gave this harness *to Industrial* around 2003 when the Richards were setting up their deer netting activities. The helicopter and pilot, Mike Richard, were provided by Industrial. The place for the activity, the ranch in Mexico, was allegedly supplied

11

through GMI's lease of the property, but the lease of the 40,000-acre ranch and all GMI leases were alleged to be verbal and remain undocumented.

The deer netting activity was not one that Mr. Hebert did over a considerable period of time during his near thirty years with Industrial. He had only been on one prior trip to net deer in Mexico four years before the accident. With regard to whose work was being done in Mexico, Defendants point out Mr. Hebert's own testimony supporting GMI's position that Mr. Hebert did various kinds of work for GMI and that Mike Richard was the boss in Mexico. Mr. Hebert, however, also testified that he had always done whatever the Richards asked him to do on farms and ranches in Louisiana, Texas, South Dakota, and Mexico and that he did not always know on whose behalf the work was being done. He further stated that he did not know on whose behalf the deer netting was done.

Mr. Hebert was a professional CDL driver with Industrial for twenty-nine years. As fuel/chemical supply manager, his duties included ordering, management, transportation, and distribution of fuel. He also described some of his work as "general facility" care. In addition to driving a fuel truck, Mr. Hebert served on various properties of the Richards as a hunting/fishing guide and all-around handy-man. He built fences, maintained feeders and blinds, cut grass, fed cattle, bailed hay, planted trees, worked on the Richards' old farmhouse, helped maintain Industrial's shop, air strip,and landing pads, and did general plumbing, welding, and carpentry. For almost thirty years he was paid by check written by Industrial. Even if some of the work was ostensibly for GMI, deer netting was not one of his regular duties with either Industrial or GMI. It constituted only one trip of a few weeks duration in 2003, about one one-thousandth of one percent of his time with the Richards.

Whether Mr. Hebert acquiesced in the deer netting activity in 2007 is contested. He alleges that he had recently remarked that he was getting too old to perform that type of activity. Mike Richard approached Mr. Hebert at work in Industrial's shop and asked him to make the trip to Mexico because no one else could go. Mr. Hebert contends that he told Mike Richard that he did not want to go to Mexico on the weekend that the accident occurred. He was marinating rabbits for an annual cook-off that he participated in every year. Mr. Hebert testified that Mike Richard then did not ask him to go, but said, "I want you there." Mr. Hebert testified that he did not have a gun to his head but that it was scary to tell the bosses no. In his affidavit, Mr. Hebert testified that he went to Mexico because he was in fear of losing his job with Industrial. He stated that he was never given additional compensation for his role in the private enterprises of J. Oran Richard, Michael Richard, and/or GMI.

With regard to the last factor, Defendants concede that Industrial did not terminate its relationship with, or relinquish control over, Mr. Hebert. They argue that, under *Humphreys* and *Perry*, this factor has less weight because the same family owned both Industrial and GMI. We disagree. J. Oran Richard testified that he owned and operated both businesses at the time of the accident. At the time of the accident, Mike Richard was a paid employee of Industrial. He was not an officer or employee of GMI. Even if Mike Richard did coordinate a deer netting operation on behalf of GMI, he did not wear two hats or run both entities as the father did in *Perry*.

In *Perry*, the injured worker drove a garbage truck for his father's sanitation company five days a week for twenty years, and he was paid solely by the sanitation company. After work and on weekends, the son did some work for his father's vault

13

and grave company and was injured while driving a vault and grave vehicle. The workers' compensation judge found that the son was an employee of the vault and grave company and found its insurer liable for benefits. On appeal, this court reversed, finding that the sanitation company was the lending employer, that the vault and grave company was the borrowing employer, and that both of their workers' compensation insurers were solidarily liable. In *Perry*, however, while the father ran both companies, we made it clear that each company "maintained separate equipment" and that the injured son "clearly acquiesced" in the exchange of services. *Perry*, 872 So.2d at 617.

In *Perry*, we cited the 1958 *Humphreys* case involving two separate companies that shared employees and found that even though one boss wore two hats, there was still a borrower-lender relationship and solidary liability. As previously stated, *Perry* and *Humphreys* were workers' compensation cases where the two employers' separate workers' compensation carriers battled over who should pay the benefits. There was no summary judgment issue regarding the separate entities and no tort immunity issue. In fact, we stated in *Perry*, "This is not a doubtful case. There was no question that [the claimant] was entitled to workers' compensation benefits. The only question was which insurance company, if not both, was obligated to pay those benefits." *Perry*, 872 So.2d at 620.

In *Humphreys*, in discussing that there were two distinct businesses, both of which were liable for workers' compensation benefits as lending and borrowing employers, the supreme court articulated as follows:

> Loans were acquired by each in its own name; bank accounts and charge accounts with merchants were carried by each in its own name. Had it not been for the fact that they each had separate compensation insurers, this case possibly would not be before us.

14

*Humphreys*, 103 So.2d at 898.

Conversely, in this case, as Mr. Hebert urges, GMI has not produced any documentation in support of its assertion that it was a separate entity entitled to tort immunity as a borrowing employer. J. Oran Richard and Mike Richard testified that Industrial and GMI worked in concert in the deer netting business and that it was a joint operation between the companies. This assertion renders the last factor of control significant because joint employment is legally distinct from borrowed employment. In *Perry*, we distinguished joint employers from borrowing and lending employers, as follows:

> Joint employment requires a "common enterprise that contemplates the employment and control of the claimant by one of the interested parties for the benefit of all." Even though Perry & Sons and Sanitation Services are owned and operated by the same individual, they are not common enterprises. Each corporation provides different services which are not dependent upon, related to, or complementary of the services provided by the other corporation.

*Perry*, 872 So.2d at 619 (citations omitted).

Here, the joint operation and common enterprise referred to by the Richards contemplates the employment and control of Mr. Hebert by Industrial for the benefit of both Industrial and GMI, and it appears that GMI was wholly dependent upon Industrial. Hence, under *Perry*, contrary to Defendants' analysis, this last factor is important even where the businesses are owned and operated by one family. Under *Perry*, GMI is not a borrowing employer. Further, the control by Industrial in this case renders Industrial, but not GMI, liable for workers' compensation benefits and entitled to tort immunity if Mr. Hebert was in the course and scope of his employment with Industrial at the time of his accident. Industrial states that he was not. Based upon the foregoing, the trial court erred as a matter of law in finding borrowed

15

servant status in this case and in granting summary judgment to Defendants on that issue.

*Intentional Tort*

If an employee is found to be in the course and scope of his employment when he is injured and the employer invokes the defense of tort immunity, the employee's remaining recourse against his employer is a claim for intentional tort. La.R.S. 23:1033.

The Louisiana Supreme Court in *Batiste v. Bayou Steel Corp.*, 10-1561, pp. 2-3 (La. 10/1/10), 45 So.3d 167, 168-69, discussed the factors involved in proving an intentional act so as to escape the coverage of the workers' compensation act.

> In order to recover in tort against Bayou Steel under La. R.S. 23:1032(B), plaintiffs must prove Mr. Batiste's injury resulted from an "intentional act." In *Bazley v. Tortorich*, 397 So.2d 475 (La.1981), we explained an intentional act requires the actor to either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. In the instant case, plaintiffs do not allege Bayou Steel consciously desired to cause harm to Mr. Batiste. Rather, they assert Mr. Batiste's injuries were substantially certain to follow from Bayou Steel's conduct.

> In *Reeves v. Structural Preservation Systems*, 98-1795 at pp. 9-10 (La.3/12/99), 731 So.2d 208, 213, we discussed the "substantial certainty" requirement as follows:

>> Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation.

>> * * *

>> " 'Substantially certain to follow' requires more than a reasonable probability that an injury will occur and 'certain' has been defined to mean 'inevitable' or 'incapable of failing.'" *Jasmin v. HNV Cent. Riverfront Corp.*, *supra* [642 So.2d 311] at 312 [La.App. 4 Cir.1994]. "[A]n employer's mere knowledge that a machine is

16

dangerous and that its use creates a high probability that someone will eventually be injured is not sufficient to meet the 'substantial certainty' requirement." *Armstead v. Schwegmann Giant Super Markets, Inc.*, 618 So.2d 1140, 1142 (La.App. 4 Cir.1993), *writ denied*, 629 So.2d 347 (La.1993). "Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." *Id.* (citing *Tapia v. Schwegmann Giant Supermarkets, Inc.*, 590 So.2d 806, 807-808 (La.App. 4 Cir.1991)).

. . . .

Likewise, plaintiffs' allegations regarding Mr. Batiste's improper work conditions and Bayou Steel's failure to supply appropriate safety equipment and tools, even if accepted as true, do not establish the accident was substantially certain to occur. In *Simoneaux v. Excel Group, LLC*, 06-1050 at p. 3 (La.9/1/06), 936 So.2d 1246, 1248, we explained that an employer's actions in providing poor working conditions might be considered negligent, or even grossly negligent, but were not intentional:

> Applying these precepts to the instant case, we cannot say plaintiffs injuries were the result of an intentional act by defendants. Even accepting plaintiffs allegations that defendants knew the worksite was congested, noisy and that manlift policies were not enforced, the fact remains that plaintiffs injuries were not an inevitable consequence of these actions. Defendants' actions may have been negligent or even grossly negligent, but they were not intentional.

This court must determine whether a question of fact remains as to whether GMI and Industrial either consciously desired the physical result of their act, whatever the likelihood of that result happening from their conduct or knew that the result was substantially certain to follow.

After reviewing the record herein, we find no evidence from Plaintiffs indicating that they will be able to establish that the employer either consciously desired this result or knew that the physical injury was substantially certain to follow the conduct. There is no evidence that modifications to the helicopter contributed to the injury or that the injury would not have occurred but for the modifications.

17

Further, Plaintiffs' reference to the previous fall does not raise issues of fact as to the safety of the operation because the other employee, Cedillo, admitted that he was not secured by the harness. Mike Richard's deposition testimony was that he had been piloting the deer netting operation with the helicopter configuration as it was on the date of the accident for a number of years and at least since 2005. He stated that he believed the operation to be safe, that he believed the harness to be safe, that he always asked the netters if their harnesses were secured before takeoff, and that he asked Mr. Hebert if his harness was secured prior to takeoff on the day of the incident. Mr. Hebert's deposition testimony indicates that he did not believe the deer netting procedure was unsafe prior to the accident, but decided it was unsafe in hindsight. None of the conduct complained of by Plaintiffs suggests that Defendants knew that the likelihood of injury was near the level of inevitability required to establish an intentional tort. Therefore, we find that no question of fact remains and that Defendants did not know and had no reason to know that injury was substantially certain to occur under the circumstances. Accordingly, we find no error in the trial court's decision to grant summary judgment in this regard.

*Spoliation of Evidence*

The trial court found that Mr. Hebert could not succeed on a spoliation of evidence claim against Defendants, granted Defendants' motion for summary judgment, and denied Mr. Hebert's cross-motion on that issue.

> Spoliation constitutes "a tort action against someone who has impaired the party's ability to institute or prove a civil claim due to negligent or intentional [destruction] of evidence." *McCool v. Beauregard Mem'l Hosp.*, 01-1670, p. 2 (La.App. 3 Cir. 4/3/02), 814 So.2d 116, 118. Thus, in order to state a cause of action in spoliation one must demonstrate two elements: (1) the intentional or negligent

18

destruction of evidence and (2) that the first element was for the purpose of depriving the plaintiff of its use.

*Arnold v. Brookshire Grocery Co.*, 09-44, p. 2 (La. App. 3 Cir. 05/06/09), 10 So.3d 1279, 1280.

"The tort of spoliation of evidence has its roots in the evidentiary doctrine of 'adverse presumption,' which allows a jury instruction for the presumption that the destroyed evidence contained information detrimental to the party who destroyed [it] unless such destruction is adequately explained." *Longwell v. Jefferson Parish Hosp. Serv. Dist. No. 1*, 07-259, p. 6 ( La.App. 5 Cir. 10/16/07), 970 So.2d 1100, 1104, *writ denied*, 07-2223 (La. 1/25/08), 973 So.2d 756 (citations omitted). Even statutory immunity from tort liability "does not, of itself, shield the employer from a claim for economic injury that the employee may suffer as a result of the employer's post-accident conduct, whether intentional or negligent, that may impair the employee's ability to recover tort damages for his injuries from third parties." *Carter v. Exide Corp.*, 27,358, p. 12 (La.App. 2 Cir. 9/29/95), 661 So.2d 698, 704 (citations omitted). The issue is the same, "Did the defendant have a duty to preserve the evidence for the plaintiff, whether arising from a statute, a contract, a special relationship between the parties, or an affirmative agreement or undertaking to preserve the evidence?" *Id.*

In its reasons for judgment, the trial court stated that the undisputed facts showed that the pilot, Mike Richard, did not remove the harness from Mr. Hebert's body for fear of aggravating his injuries, that Mr. Richard tried to retrieve the harness on the same date the accident occurred, and that hospital personnel in Mexico had cut away the harness and disposed of it. The record, however, reveals that Ramon Rangel, another Richard employee, went to the hospital, which was in Eagle Pass,

Texas, not Mexico, the day *after* the accident, not the day of the accident, and was told that the harness had been discarded.

The trial court did not discuss the three-foot piece of webbing, or lanyard, that was attached to the harness or the carabiner that attached the other end of the lanyard to the seatbelts in the helicopter. Mike Richard testified that he saw the lanyard trailing out of the helicopter with Mr. Hebert when he fell. Ramon Rangel was working on the ground, heard of the accident, and arrived at the scene within minutes. He stated that Mike Richard told him to stay with Mr. Hebert while he went to find a board to stabilize his back. Mike Richard left in the helicopter. Rangel testified that he saw the harness still on Mr. Hebert's back as he lay there on the ground, but he did not see the three-foot strip of lanyard.

Mike Richard returned in the helicopter with the board. Men on the ground helped put Mr. Hebert in the helicopter, and Rangel rode with him in the helicopter to the hospital in Eagle Pass. Rangel said that he watched the hospital personnel in the emergency room cut away the harness. No one asked for the harness at that time. By the next afternoon, Mike Richard had obtained another harness and lanyard from Paul Marks and had lined up another netter to finish the deer netting job in Mexico. He asked Rangel to check at the hospital in Eagle Pass to see about the harness.

There appears to be no explanation for the missing lanyard and carabiner that was supposed to have tethered Mr. Hebert's harness to the seat belts in the helicopter, and that Mike Richard indicated was still attached to the harness and trailing out of the helicopter behind Mr. Hebert. As stated, the trial court did not discuss the missing lanyard and carabiner, important elements in the restraint system that apparently never made it to the hospital.

20

Defendants argue that Mr. Hebert, like Mr. Cedillio before him, failed to buckle himself into the helicopter and that his fall was his own fault. Mr. Hebert even apologized to the Richards for failing to buckle up and for causing them so much trouble. The record, however, reveals issues of material fact regarding whether the buckles, i.e., the carabiner and other connecting devices, did not catch, or otherwise failed when they were engaged. We note that, in a tort suit, a plaintiff's comparative negligence merely reduces his recovery; it does not bar his suit. La.Civ.Code Art. 2323.

In *Longwell*, 970 So.2d 1100, the court found that a hospital's inadvertent loss or destruction of x-ray images taken during a procedure, in violation of a statutory duty to keep records for three years, did not support the patient's claim for spoliation of evidence absent any evidence that the loss or destruction was intentional. There, the violation of the duty to keep the records was, however, actionable in negligence.

Here, the record creates genuine issues of fact regarding whether Mike Richard's actions in failing to preserve the lanyard, carabiner, and harness were intentional or merely negligent precluding summary judgment in favor of Mr. Hebert on his cross motion. Therefore, both summary judgments on spoliation, Defendants' and Plaintiffs', should have been denied. In this case, this is a question to be resolved by a trial on the merits.

**CONCLUSION**

Based upon the foregoing, we reverse the summary judgments granted to Defendants on employment status/tort immunity and spoliation of evidence. We affirm the denial of Plaintiffs' cross motion for summary judgment on the issue of

21

spoliation and Defendants' motion with regard to intentional tort. We remand the case to the trial court for further proceedings consistent with this opinion and for a trial on the merits on all of the above issues. Costs of this appeal are assessed seventy-five percent to Defendants and twenty-five percent to Plaintiffs.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

TOMMIE HEBERT AND MELISSA ANNE HEBERT

VERSUS

J. ORAN RICHARD, ET AL.


**THIBODEAUX, Chief Judge, dissenting in part.**


I agree with the majority on all issues, except its treatment of intentional tort. I would reverse the judgment of the trial court on this issue.

The trial court performed no legal or factual analysis in its written reasons for granting summary judgment to the defendants on the issue of intentional tort. The court merely stated the defendant's contentions that Mr. Hebert acknowledged that the Richards had been like family to him and further acknowledged his belief that they would not assign him a task that would almost certainly result in his injury. The trial court later stated that summary judgment was granted on this issue "for the reasons more fully set forth above." The record does not support summary judgment on the issue of intentional tort.

The record reveals that deer netting was a dangerous activity, that the harness was nine to twelve years old at the time of Mr. Hebert's injury, and that the harness was a climbing harness not intended for deer netting. The record further reveals that the instruction on the use of the harness lasted five to fifteen minutes in 2003, and that the hookups for the harness were further modified in the four years between Mr. Hebert's first deer netting activity in 2003 and the time of his accident in 2007. Moreover, another Industrial employee, Luis Cedillio, had fallen from the

helicopter using the same harness and restraint system during a deer netting activity in Mexico, prior to Mr. Hebert's fall.

To succeed on an intentional tort claim, the employee must prove the employer's intent which is defined as: (1) consciously desiring the physical results of the particular conduct, *or* (2) knowledge that the physical results were substantially certain to follow the conduct. *Bazley v. Tortorich*, 397 So.2d 475 (La.1981). Here, Mr. Hebert does not assert that the defendants consciously desired that he suffer injury. Rather, he contends that the defendants, Industrial and GMI, knew that physical injuries were substantially certain to follow the continued use of the harness and helicopter as they were being used for deer netting activities in Mexico. The question does *not* revolve around any past belief or trust by Mr. Hebert in the Richard family, for whom he had worked since he was approximately eighteen years old. Knowledge is the condition of the *defendant's* mind. *See Carey v. UMC (United Mechanical Contractors)*, 553 So.2d 472 (La.1989). The question is the knowledge by GMI and Industrial that physical injuries were substantially certain to occur with the harness and helicopter modifications they incorporated for the deer netting activities in Mexico.

In *Wainwright v. Moreno's, Inc.*, 602 So.2d 734 (La.App. 3 Cir. 1992), an employee, injured when a ten foot ditch in which he was working caved in on him, alleged an intentional act by his employer where the employer's foreman ordered the employee into the ditch which had caved in the day before. In affirming the trial court's judgment in favor of the employee, our court discussed the Louisiana Supreme Court's decision in *Bazley* and the meaning of intentional tort:

> The meaning of intent in this context is that *the defendant either desired to bring about the physical results of his act or believed* they were substantially certain to follow from what he did. Several courts of appeal have stated the two

2

> prongs of the definition in the conjunctive, thus requiring
> a plaintiff to prove, in order to recover, that the defendant
> desired the physical results of his act in every case. Intent
> is not, however, limited to consequences which are desired.
> If the actor *knows* that the consequences are certain, or
> *substantially* certain, to result from his act, and still goes
> ahead, he is treated by the law as if he had in fact desired
> to produce the result.

*Wainwright*, 602 So.2d at 738 (quoting *Bazley*, 397 So.2d at 482) (citations omitted) (emphasis added).

In *Wainwright*, testimony showed that the employer knew that the dirt was sloughing off the sides of the ditch. The court also considered evidence that the Occupational Safety and Health Act (OSHA) required that the sides of a ditch in unstable or soft material, "which sides are more than five feet in depth, shall be shored, sheeted, braced, sloped, or otherwise supported." *Wainwright*, 602 So.2d at 739. There, based upon the facts, we found that the employer knew that the cave-in was substantially certain to follow.

Here, Mr. Hebert cited numerous violations of FAA (Federal Aviation Act) rules regarding Mike Richard's failures to report or log the flights and the harness and helicopter modifications in Mexico. Mr. Hebert further argues that the conversion of the harness violated OSHA (Occupational Safety and Health Act) and ANSI (American National Standards Institute) standards and violated the LPLA (Louisiana Products Liability Act). A violation of safety standards, without more, is generally not sufficient for proving an intentional tort. *See Williams v. Gervais F. Favrot Co., Inc.*, 573 So.2d 533 (La.App. 4 Cir.), *writ denied*, 576 So.2d 49 (La.1991). In this case, however, there is more, and the use, conversion, and modification of an old climbing harness as fall protection, the modification of an aircraft for a questionable "cash only" activity in a foreign country, and the assertion of numerous regulatory violations, along with the testimony, are sufficient to at least

3

create genuine issues of material fact precluding summary judgment on what the employer was thinking.

Paul Marks testified that Mike Richard talked to him around 2003 about a harness for holding a deer netter in a helicopter, and Marks gave Richard the climbing harness that he happened to have in his truck. Marks further testified that the lanyard that came with the harness was too long, and that he had purchased a shorter strip of webbing for Industrial's use. Mike Richard testified that he did not consult any OSHA, ANSI, or CSA regulations when he devised the restraint system and helicopter modifications for the deer netting activities. Additionally, Paul Marks testified that in 2003 he had spent only five to fifteen minutes showing Mr. Hebert, Neil Gremillion, and Luis Cedillio how to use the harness and webbing.

Marks further testified that Mike Richard had changed the configuration of the restraint system before Mr. Hebert's fall in 2007, using a carabiner hook-up instead of the closed loop system that Marks had suggested. Mike Richard testified that, where seconds count, the carabiner provided a quicker connect. The record reveals that there was no significant safety training on deer netting from a helicopter, with little more than Mike Richards's reminder to buckle up. Various testimony indicated that deer netting could be an adventure, a young man's sport, but that it was very physical and involved hard work for about twelve hours a day, from sun-up to sun-down. Evidence of fall instruction or training on physical techniques for minimizing injury should one fall from the helicopter while netting deer is non-existent.

The first circuit in *Abney v. Exxon Corp.*, 98-0911 (La.App. 1 Cir. 9/24/99), 755 So.2d 283, *writ denied*, 99-3053 (La. 1/14/00), 753 So.2d 216, affirmed the trial court's award of damages to welders who brought a tort action against their

4

employer for exposure to known human carcinogens. There, the welders complained that each time they worked in the tower they suffered nose bleeds and health problems. The court articulated that "[a] distinguishing feature in determining whether the conduct complained of meets the 'substantial certainty' test is whether the event has occurred before or whether the injury has manifested itself before." *Id*. at 288. In the present case, the event, a fall from the helicopter during deer netting, had occurred before.

In *Clark v. Division Seven, Inc.*, 99-3079 (La.App. 4 Cir. 12/20/00), 776 So.2d 1262, *writ denied*, 01-183 (La. 3/16/01), 787 So.2d 318, the fourth circuit affirmed the trial court's finding of intentional tort in favor of a roofer who sustained injuries when he fell from a wet roof while working on a church about three stories high. There, the employer required the roofer to return to the roof after each heavy rainfall, even after the roofers had complained that the roof was too slippery and another roofer had slid off the roof, but caught himself on a block of wood before hitting the ground.

Similarly, Mr. Hebert asserts that he had recently stated he was too old to do the deer netting and that it was unsafe. He told Mike Richard that he did not want to go in 2007 when the accident occurred, but Richard replied that he wanted him there. Mr. Hebert had not done the activity since the first trip approximately four years before, and Mike Richard knew that Mr. Hebert did not want to go. Deer netting was not part of Mr. Richard's regular duties. Another Industrial employee, Luis Cedillio, had fallen from the same helicopter, modified in Mexico, using the same harness that Mr. Hebert used when he fell. Luis Cedillio did not report any injuries and testified that he had simply forgotten to buckle up. Testimony indicated that Mr. Cedillio netted regularly and was considered a flying squirrel because of his

5

size and agility, and that he had hit the ground running. Mr. Hebert, however, was a big man, weighing 250 to 270 pounds, and the restraint system had to be adjusted for him. Mr. Hebert asserts that he went because he feared losing his job with Industrial.

In view of *Wainwright*, *Abney*, and *Clark*, the total facts and circumstances at least create material issues of fact that preclude the granting of the defendants' motion for summary judgment on Mr. Hebert's alternative claim of intentional tort. *See also Williams v. Ingredient Tech. Corp.*, 470 So.2d 283 (La.App. 5 Cir. 1985) (reversed summary judgment for the defendants due to issues of fact regarding whether supervisor must have believed and known that injury was substantially certain to result from his instructions); *and see McDonald v. Gonzales*, 479 So.2d 9 (La.App. 5 Cir. 1985) (reversed summary judgment due to issues of fact regarding whether the foreman who ordered the painter to continue working after his complaints of dizziness was substantially certain that the result would follow).

Finally, the majority applies the incorrect methodology in its determination that summary judgment was appropriate on this issue. The majority's assertion that "we find no evidence from Plaintiff indicating that he *will be able* to establish that the employer either consciously desired this result or knew that the physical injury was substantially certain to follow the conduct" is simply wrong. The test is *not* whether a plaintiff *would* be able to establish an element of proof; rather, the test is whether one *could* establish it. David W. Robertson, *Summary Judgment and Burden of Proof*, 45 La. B.J. 331 (1997).

For the foregoing reasons, I respectfully dissent in part.

6

NUMBER 10-1417

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

TOMMIE HEBERT AND MELISSA ANNE HEBERT

VERSUS

J. ORAN RICHARD, ET AL.

AMY, J., concurring in part and dissenting in part.

I agree with the majority opinion insofar as it affirms the summary judgment entered on the intentional tort issue. I, therefore, concur in that part of the opinion. However, I respectfully dissent from the majority's conclusions on the other issues, as I would affirm each of the summary judgments entered by the trial court.

First, I find that the defendants sustained their burden of proof with regard to borrowed employee status since, in my opinion, the parties' submissions lead only to the conclusion that La.R.S. 23:1031(C) is applicable to this employment situation. Undoubtedly Mr. Hebert was an employee of Industrial Helicopters. However, the evidence demonstrates that one of Industrial's functions was to provide its fleet and employees to Game Management for the furtherance of the latter company's operations. Thus, I find that, at the time of the accident, Mr. Hebert was fulfilling the roles of both companies under the borrowed employee factors. *See Perry v. Perry & Sons Vault & Grave Serv.*, 03-1519 (La.App. 3 Cir. 5/12/04), 872 So.2d 611; *Green v. Popeye's, Inc.*, 619 So.2d 69 (La.App. 3 Cir. 1993). In fact, in light of the dual roles played by the management personnel, it seems to me that the factors, by and large, are equally applicable to both companies. Thus, I would affirm this aspect of the trial court's ruling.

Neither do I find error in the summary judgment entered regarding spoliation of the evidence. In short, the plaintiff produced no evidence indicating that he will

be able to prove that the defendant failed to retain the subject harness in order to deprive the plaintiff of its use.

For these reasons, I would affirm the trial court's ruling in full.