603 So.2d 754 (1992)
Leon BILLEAUD, III and Kelly Loomis Billeaud
v.
Leo POLEDORE, Jr., et al.
91 CA 0836.
Court of Appeal of Louisiana, First Circuit.
May 22, 1992.
Rehearing Denied August 10, 1992.
*755 Grady M. Spears, Lafayette, for plaintiffs Leon Billeaud, III, Kelly Loomis Billeaud.
James M. Dill, Lafayette, for intervenor Highland Ins. Co.
Edward P. Lobman, Metairie, for defendants Leo Poledore, Jr., Sam Broussard Trucking Co., Inc., U.S. Fire Ins. Co.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
WHC, Inc. (WHC) contracted with Exxon Pipeline (Exxon) to lay pipe at a job site in West Baton Rouge Parish. Leon Billeaud, III, was working as a general laborer for WHC on September 26, 1987. On that date, Leo Poledore, Jr., an employee of Sam Broussard Trucking, Inc. (Broussard), delivered to the WHC job site a load of pipe which Exxon had purchased from Bayou Pipe Coating, Inc. Poledore was operating a tractor and flatbed trailer owned by J.S. & J. Trucking Company of New Iberia and leased to Broussard. Plaintiff was injured while helping unload the pipe. Plaintiff sued Poledore, Broussard, and Broussard's insurer, United States Fire Insurance Company (defendants). His wife, Kelly Loomis Billeaud (Mrs. Billeaud), joined in the suit seeking damages for loss of consortium. Highlands Insurance Company (intervenor), the worker's compensation insurer of WHC, intervened to recover medical payments and weekly indemnity benefits paid to plaintiff.
The jury found Poledore was a "borrowed employee" of WHC at the time of the accident. The trial court then rendered judgment in favor of defendants, rejecting the demands of Mr. and Mrs. Billeaud (collectively referred to herein as plaintiffs) and intervenor. Both plaintiffs and intervenor (appellants) have appealed.

WAS POLEDORE A BORROWED EMPLOYEE?
Appellants contend the jury was manifestly erroneous in finding Poledore was a borrowed servant of WHC. Tort immunity under the borrowed servant doctrine is an affirmative defense within the context of a tort action. Brumbaugh v. Marathon Oil Co., 507 So.2d 872, 874-75 (La.App. 5th Cir.), writ denied, 508 So.2d 824 (La.1987). When a general employer attempts to avoid liability for the actions of *756 its employee by contending the employee was loaned to another employer, the general employer bears the burden of overcoming by a preponderance of the evidence the presumption that he is liable. Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951); see also LeBlanc v. Roy Young, Inc., 308 So.2d 443, 447-48 (La.App. 3d Cir.), writ denied, 313 So.2d 240 (La.1975).
Louisiana courts as well as federal courts interpreting Louisiana law have set forth several factors to consider in determining whether an employee is a borrowed servant, none of which is decisive: (1) first and foremost, who has the right of control over the employee beyond mere suggestion of details or cooperation; (2) who selected the employee; (3) who paid the employee's wages; (4) who had the right to fire the employee; (5) who furnished the tools and the place to perform the work; (6) whether the new employment was over a considerable length of time; (7) whose work was being done at the time of the accident; (8) whether there was an agreement between the borrowing and lending employers; (9) whether the employee acquiesced in the new work situation; and (10) whether the original employer terminated his relationship with or relinquished his control over the employee. Carter v. Chevron Chemical Co., 593 So.2d 942, 947 (La.App. 4th Cir.), writ denied, 596 So.2d 211 (La.1992); Brumbaugh v. Marathon, 507 So.2d at 875.
These factors are factual inquiries which should be determined by the jury; they will not be upset unless they are clearly wrong. Brumbaugh v. Marathon, 507 So.2d at 876.
Our review of the record in light of these factors reveals the following. Poledore testified that the truck he was driving at the time of the accident was owned by J.S. & J. and was leased to Broussard; that no one but Broussard ever paid him to drive the truck; that at the time of the accident he was being paid by Broussard; that the Broussard dispatcher selected him to deliver the pipe to WHC and gave him directions to the job site; that after arriving at the site he sat in his truck for approximately two hours waiting to unload; that he was not expected to help WHC employees physically unload the pipe; that no one at WHC told him how to drive the truck; that he would not have allowed a WHC employee to drive the truck; and that if the WHC foreman had ordered him to get out of the truck and let someone else drive, he would not have obeyed.
John M. Dureo, the WHC general superintendent on this job, testified that the only things a truck driver normally did were things connected with his truck; that he never told a truck driver how to drive; that he could not fire a truck driver if he was not doing his job correctly but could only tell him to park the truck or get off the job; that if the field was muddy, either he or the truck driver could decide not to drive into it; that if the field was too muddy, the pipe was stockpiled at the site and WHC rented equipment later to string it;[1] and that WHC employees told the driver where to take the pipe to string it and when to stop and start during the stringing process.
Randy Brown, the WHC job foreman, testified that he directed Poledore to the point to begin unloading and instructed him to move forward after each pipe was lifted off; that he did not tell Poledore how to drive the truck; that he could not fire Poledore but could only refuse to unload his truck; and that he had never asked a driver to help physically unload pipe.
Vincent Coreil, the WHC vice-president in charge of engineering and estimating, also testified. He stated that no written contract existed between WHC and Broussard; that WHC never agreed to take control of Broussard's drivers once they got to the jobsite; that WHC never agreed to supervise Broussard's employees; that the truck driver has total control of his vehicle and determines for himself whether it is safe to go into the field; and that the only directions given to the drivers pertain to how to get to the jobsite.
*757 The final witness regarding the borrowed servant issue was Daniel E. Jones, Broussard's operations manager. Jones testified that it is customary for drivers to help string pipe; that Broussard agreed to allow its drivers to be engaged in the stringing process; that WHC employees supervised the stringing; and that it is common knowledge in the oil field industry that a driver is under the contractor's control while stringing pipe. Jones admitted, however, that by "control" he meant that a WHC employee told the driver when to stop and when to move forward. He further admitted that WHC could neither fire Poledore nor give him a raise; that there was no written contract between Broussard and WHC which relinquished Broussard's employees to WHC at the jobsite; and that a driver "was expected and allowed to refuse" to unload on a stringing job if he thought it would harm himself or the truck.
In LeBlanc v. Roy Young, Inc., 308 So.2d 443, with facts very similar to those in ours, the court found that a general employer did not relinquish control over a dragline operator simply because the services of the dragline required cooperation with and from the employees of the driller at whose jobsite he was working.
The words of Justice Holmes regarding liability for the negligent acts of a driver of a horse-drawn wagon, as quoted by the Louisiana Supreme Court in Benoit, are also instructive:
'[A]lthough a driver may be ordered by those who have dealt with his master to go to this place or that, to take this or that burden, to hurry or to take his time, nevertheless in respect to the manner of his driving and the control of his horse he remains subject to no orders but those of the man who pays him. Therefore he can make no one else liable if he negligently runs a person down in the street. * * *'
Benoit, 53 So.2d at 142, citing Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922 (1902).
The jury in this case was instructed to consider the ten factors listed above and then answer one interrogatory: "Do you find that Leo Poledore, Jr., was the borrowed employee of W.H.C.?" The jury answered: "Yes." We must assume the jury found that the preponderance of these factors showed WHC had control over Poledore at the time of the accident. Based on the evidence and the jurisprudence outlined above, however, we hold that the jury was clearly wrong in this finding, and we reverse.
Because the jury incorrectly decided the borrowed servant issue, it never reached the issues of liability and damages. We must, therefore, make a de novo determination of those issues.

LIABILITY
Appellants contend the sole cause of this accident was the negligence of Poledore. Defendants contend the accident was caused by the negligence of plaintiff and other WHC employees. The following facts are undisputed.
On the day of the accident, the weather was clear and dry. The parties were stringing pipe. Poledore was driving the truck, a tractor pulling a flatbed trailer loaded with 42-foot lengths of 6-inch pipe. Poledore drove to a point along the right-of-way specified by WHC and unstrapped the single binder securing the load. A WHC vehicle with a side boom and calipers came alongside the truck. Plaintiff and Charles Mitchell, another WHC employee, climbed atop the load of pipe. Three WHC employees worked on the ground beside the truck. The boom swung over the load of pipe. Mitchell, assisted by plaintiff, who was using a pry bar, hooked the calipers to a length of pipe. The pipe was then lowered to the proper place on the right-of-way. Two of the ground crew placed blocks of wood under the pipe, and the third ground crew member unhooked the calipers. One of the WHC employees then yelled for Poledore to move the truck forward and yelled again when they had reached the point to unload another length of pipe.
At some point the parties reached an obstruction in the right-of-way. Several lengths of pipe were unloaded, and Brown told Poledore to go to a point approximately *758 one-fourth of a mile away on the other side of the obstruction. To do so, Poledore was required to make a 180-degree turn, then a wide U-turn consisting of two right turns. Poledore refastened the binder strap, then made the 180-degree turn and the first right turn. When Poledore attempted to make the final right turn, the right rear wheel of the trailer went into a ditch. The load shifted, and the binder strap broke. Plaintiff, who had been atop the pipe holding onto the headache rack,[2] was thrown to the ground. He was struck by falling pipe and suffered a significant injury to his left leg.
The events immediately preceding the accident are in dispute. Brown testified the WHC employees helped Poledore make the 180-degree turn by making sure he did not drive over pipe that had already been strung or drive into a drainage ditch. Plaintiff testified he and Mitchell got off the truck while Poledore turned around. According to plaintiff, he and Mitchell walked alongside the truck to make sure it cleared the ditches. Mitchell testified, however, that he and plaintiff never got off the truck. Mitchell's testimony was corroborated by Poledore.
The witnesses agree that before the accident Brown and the ground crew left to go to the site on the other side of the obstruction. The only witnesses to the ensuing events were plaintiff, Mitchell, and Poledore. Plaintiff testified that after the truck made the big turn and had cleared the ditches, he and Mitchell got back atop the pipe for the one-fourth of a mile ride to the work site; that the truck was traveling at walking speed; that when they got to the gravel road where the truck had to turn right, it appeared Poledore intended to back up or turn left because he moved the truck to the left; that instead, he jackknifed the trailer two times to move it further left; that on the third try, Poledore started forward; that he and Mitchell realized Poledore could not successfully complete the turn; that they began to shout, "Don't go, you are not going to make it!"; that Poledore slowed down, looked in his rearview mirror, "dumped the clutch" (suddenly accelerated), and turned; that a few seconds later the truck's rear wheels hit the ditch; and that he was then thrown to the ground.
Mitchell testified that he never directed Poledore in any manner during his jackknifing maneuver; that he thought Poledore was going to turn left; that the truck was just barely moving when it began to turn right; that when they realized the truck was turning right he and plaintiff yelled, "Whoa!"; that plaintiff hit the side of the truck and yelled for Poledore to stop because he could not make the turn; that suddenly Poledore accelerated; that the rear wheels of the trailer went into the ditch; that he rolled off the trailer with the pipe; that he was not injured, although his hard hat was smashed; and that he did not see plaintiff fall from the truck.
Poledore's recollection of the accident varies considerably from that of Mitchell and plaintiff. Poledore testified Mitchell and plaintiff helped direct him as he jackknifed. He had no problem hearing them. After he jackknifed the second or third time, they told him he had it made. He looked at the ditch himself, however, and knew he could not make the turn. He jackknifed again, and when he heard nothing from them, he "just took on off." At the instant before the trailer went in the ditch, he looked in the outside mirror but could see nothing. He knew something was wrong when the truck stopped pulling. He got out of the truck and found the right rear of the trailer in the ditch, two or three joints of pipe off the trailer, and plaintiff on the ground.
Poledore clearly was negligent in making a right turn when he could not safely do so. Defendants contend, however, that plaintiff, knowing the truck had to make two 90-degree turns, was also negligent in riding on his precarious perch atop the pipe during these maneuvers. Plaintiff had to ride on the trailer while stringing pipe, but he was not required to *759 do so for the one-fourth of a mile trip to the site where stringing was to resume. Plaintiff got on the truck simply because he did not want to walk. Poledore testified he would have permitted plaintiff to ride in the cab with him had he asked. Brown, plaintiff's supervisor, testified he would not have been happy had he seen plaintiff get back atop the pipe.
We find plaintiff acted unreasonably in choosing to ride in the dangerous position atop the pipe while Poledore executed the turning maneuvers. This unreasonable conduct constitutes negligence which will reduce his recovery. However, the driver of a vehicle with a guest passenger riding in an unusual position is required to use due care commensurate to the passenger's insecure position on the vehicle. Jones v. Indemnity Insurance Co., 104 So.2d 197, 199-200 (La.App.2d Cir.1958). We thus find plaintiff's fault is 35%; Poledore's fault is apportioned at 65%. See Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985).

DAMAGES
It is undisputed plaintiff suffered a significant injury to his left leg and has a permanent disability of the left knee. Plaintiff was treated and released from the emergency room at Baton Rouge General Hospital on the day of the accident. Dr. John Cobb, a Lafayette orthopedist, began treating plaintiff within a week of the accident. His diagnosis nine months after the accident was a severe contusion of the medial thigh which resulted in lack of strength and endurance of the medial hamstring. About a year after the accident, plaintiff began to have problems with swelling and pain in his left knee. Cobb performed arthroscopic surgery on November 29, 1988, and found chondromalacia[3] of the kneecap and a mid-third tear of the lateral meniscus (cartilage). During the surgery he debrided the kneecap and removed part of the torn cartilage. Cobb found these knee injuries consistent with plaintiff's accident.
Cobb prescribed supervised physical therapy for plaintiff from October 1987 until March 1988, and again from January 11, 1989, through February 22, 1989. Margaret Rozas, plaintiff's physical therapist, testified she saw plaintiff 65 times.
On July 17, 1989, Cobb told plaintiff he had reached maximum medical cure. He gave plaintiff a knee brace and told him he could return for symptomatic treatment, such as cortisone injections, anti-inflammatory drugs and non-narcotic pain medications. He stated it is likely plaintiff will require some of this treatment because of the chronic nature of his symptoms. If plaintiff's symptoms become uncontrollable and he has "an acute exacerbation that becomes unacceptable," Cobb would offer him surgery to remove the kneecap or a kneecap resection. This surgery would cost $3,000.00 to $4,000.00.
Dr. Gerald L. Davis, a New Orleans orthopedic surgeon, examined plaintiff in October 1989 at his attorney's request. Davis ordered an MRI and a thermogram and diagnosed chondromalacia with patellar femoral pain. He also believed plaintiff had "a bit of a reflex sympathetic dystrophy." He found these problems consistent with the history of plaintiff's accident. He recommended arthroscopy to shave the kneecap and open knee surgery to divide the tendon and realign the kneecap. He believed this surgery, which would cost between $8,000.00 and $10,000.00, would reduce plaintiff's pain by 70%. Plaintiff would also need follow-up office visits which would cost $200.00 to $250.00 for the first 18 months.
Plaintiff was also seen by Dr. J. Lee Leonard, a Lafayette orthopedic surgeon. Leonard examined plaintiff at the request of WHC six months after the accident. He noted a five-inch bruise on plaintiff's left thigh and swelling in his left calf. At that point he diagnosed soft tissue damage to the left leg. He did not find any problem with plaintiff's knee. He told plaintiff that returning to his normal activities, including working, would help build up strength in his leg.
*760 Leonard saw plaintiff again on October 30, 1989, after his arthroscopic surgery. Leonard found plaintiff had recovered well from the surgery and had full range of motion of the knee. An x-ray taken on that visit showed plaintiff had a healed fracture of the left fibula, the small outer leg bone. The fracture apparently had healed without treatment; it was in excellent alignment.
Leonard saw plaintiff at the request of defense counsel on January 24, 1990. Leonard and plaintiff discussed the surgery recommended by Davis. Leonard was of the opinion that further surgery on plaintiff's knee would be a mistake. He found no evidence of either reflex sympathetic dystrophy or malalignment of the kneecap. He stated that in his experience, kneecap realignment was successful only if the kneecap is seriously malaligned. If forced to recommend either kneecap removal or realignment, he would recommend removal. However, he would not recommend that surgery to plaintiff because it results in 30% to 40% loss of strength of the leg.
The three physicians agreed plaintiff has a permanent disability of the left leg. Their opinions regarding the percentage of disability of the leg ranged from 10% (Dr. Leonard) to 35% (Dr. Cobb, the treating orthopedist). They also agreed plaintiff's kneecap will slowly deteriorate, his percentage of disability will increase with time, and the percentage of disability will increase if he has any of the surgeries discussed above.
Based on this evidence, we find plaintiff is entitled to general damages for pain and suffering and physical disability in the sum of $95,000.00. Plaintiff is also entitled to stipulated past medical expenses of $10,607.56 and future medical expenses of $20,000.00.
Plaintiff also seeks damages for past lost wages and loss of earning capacity. Plaintiff dropped out of college in his senior year after he and his wife divorced. (His wife had been supporting him.) He preferred outdoor work, so he worked in a series of blue collar jobsoil field worker, truck driver, route delivery salesman for an industrial fastener company, welder's helper, apprentice cabinet maker, and general laborer. The present Mrs. Billeaud has worked steadily for an accounting firm and, according to their tax returns for the five years preceding the accident, was the primary family wage earner. Plaintiff's annual income from 1982 through 1987 ranged from approximately $5,800.00 to just under $12,000.00. There is no evidence regarding whether he ever intended to work full time at some point in the future.
Plaintiff presented the testimony of an expert economist, Dr. Bernard Pettingill. Pettingill calculated plaintiff's lost wages from the date of accident until the time of trial, a 2-1/2 year period, at $44,201.00. These calculations assumed plaintiff would have worked full time at the wage he was earning at the time of the accident. His lost wages for the same period, calculated using his average earnings for five years before trial, would be $20,943.39.
Pettingill also calculated plaintiff's future lost wages, discounted to present value, using both the wage he was making at the time of the accident and his actual average earnings. Those figures were $362,790.00 and $158,211.95, respectively. All three physicians opined that plaintiff could return to at least light duty work. (Leonard thought plaintiff could return to manual labor.) Plaintiff's expert in vocational rehabilitation, Glenn M. Hebert, testified light duty jobs for which plaintiff was qualified were available in the Lafayette area. Pettingill thus testified any award for future loss of wages or earning capacity should be reduced by $85,586.00, the amount plaintiff could earn in light duty employment. We find the sum of $175,000.00 will adequately compensate plaintiff for his lost wages and loss of earning capacity.[4]
*761 Mrs. Billeaud seeks damages for loss of consortium. She and plaintiff have been married for ten years. She testified their sexual relations were impaired for four months after the accident. They can no longer go water skiing or horseback riding, which they enjoyed before the accident. She also testified her husband is harder to get along with now because the pain causes him to be more irritable. We find an award of $10,000.00 will adequately compensate Mrs. Billeaud for her loss of consortium.
The parties stipulated the intervenor paid medical benefits to or on behalf of plaintiff in the sum of $9,009.00 and worker's compensation indemnity benefits of $16,693.00. Intervenor is entitled to recover these sums out of plaintiff's judgment. However, intervenor's recovery must be reduced by the percentage of negligence attributed to plaintiff. LSA-R.S. 23:1101(B).
For the foregoing reasons, we reverse the decision of the trial court and render judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of intervenor, HIGHLANDS INSURANCE COMPANY, and against defendants, LEO POLEDORE, JR., SAM BROUSSARD TRUCKING, INC., and UNITED STATES FIRE INSURANCE COMPANY, in solido, in the sum of $16,706.30, representing the total compensation paid by it of $25,702.00, less a reduction of $8,995.70 (35%) for the comparative negligence of Leon Billeaud, III, together with legal interest thereon from date of judicial demand until paid, to be paid by precedence and priority to intervenor before any amounts are paid by defendants to plaintiffs.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, LEON BILLEAUD, III, and against defendants, LEO POLEDORE, JR., SAM BROUSSARD TRUCKING, INC., and UNITED STATES FIRE INSURANCE COMPANY, in solido, in the sum of $178,688.62, representing his total damages of $300,607.56, less a reduction of $105,212.64 (35%) for his comparative negligence, less a further reduction of $16,706.30 for the sum paid to intervenor out of plaintiff's recovery, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, KELLY LOOMIS BILLEAUD, and against defendants, LEO POLEDORE, JR., SAM BROUSSARD TRUCKING, INC., and UNITED STATES FIRE INSURANCE COMPANY, in solido, in the sum of $6,500.00, representing her damages for loss of consortium of $10,000.00, less a reduction of $3,500.00 (35%) for the comparative negligence of Leon Billeaud, III, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs of these proceedings be taxed to defendants, LEO POLEDORE, JR., SAM BROUSSARD TRUCKING, INC., and UNITED STATES FIRE INSURANCE COMPANY.
REVERSED AND RENDERED.
NOTES
[1] To string pipe is to unload it in a line along the right-of-way where it will be buried in a ditch and then become part of a petrochemical pipeline.
[2] The headache rack is a sheet of heavy metal mesh immediately behind the cab of the tractor which prevents pipe from coming through the back of the cab in the event of a sudden stop.
[3] Chondromalacia is premature degeneration and softening of the cartilage.
[4] Hebert testified plaintiff was physically capable of performing a sales job which would pay $6.00 per hour. Pettingill testified that if plaintiff worked full time in a sales job he would earn more than he earned on the average before the accident. Defendants contend plaintiff should not receive an award for loss of earning capacity because of this evidence. However, there is no evidence plaintiff has the aptitude to do sales work. Furthermore, the law is clear that damages can be awarded for loss of earning capacity even if the plaintiff earns more money after the accident than before because earning capacity is not measured by actual loss. Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1st Cir.), aff'd, 574 So.2d 344 (La.1990); Landry v. Melancon, 558 So.2d 1143, 1148 (La.App. 1st Cir.1989).