Judgment rendered January 11, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,623-CW

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ANTHONY HERNANDEZ and        Respondents
REBECCA EADES, individually
and on behalf of decedent,
CAMRON HERNANDEZ, and
COLTON HAWKINS

versus

AETHON ENERGY        Applicant
OPERATING, LLC

* * * * *

On Application for Writs from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 79,386

Honorable Amy Burford McCartney, Judge

* * * * *

| | |
|---|---|
| MAYER SMITH & ROBERTS, LLP<br>By: Caldwell Roberts, Jr. | Counsel for Applicants,<br>Aethon Field Services,<br>LLC and Aethon Energy<br>Operating, LLC |
| | |
| GIEGER LABORDE & LAPEROUSE, LLC<br>By: Attie Babin Carville<br>    Robert Irwin Siegel | Counsel for Applicant,<br>Federal Insurance<br>Company |

PETTIETTE ARMAND DUNKELMAN
By: Donald James Armand, Jr.

Counsel for Respondent,
G&D Well Services, Inc.

LEWIS BRISBOIS
By: Sarah Russell Smith

Counsel for Respondent,
Axis Surplus Insurance
Company

DEGAN, BLANCHARD & NASH APLC
By: Mandy Ann Simon
    Sydney Wallis Degan, III

Counsel for Respondents,
USFS and Nautilus
Insurance Company

GREGORIO, CHAFIN, JOHNSON,
TABOR & FENASCI, LLC
By: Scott J. Chafin, Jr.
    Julie Payne Johnson

Counsel for Respondents,
Anthony Hernandez,
Rebecca Eades, Camron
Hernandez, and Colton
Hawkins

ETHAN ARBUCKLE

Counsel for Respondents,
Anthony Hernandez,
Rebecca Eades, Camron
Hernandez, and Colton
Hawkins

RHYS BURGESS

Counsel for Respondents,
Anthony Hernandez,
Rebecca Eades, Camron
Hernandez, and Colton
Hawkins

\* \* \* \* \*

Before PITMAN, COX, and ROBINSON, JJ.

**ROBINSON, J.**

Anthony Hernandez and Rebecca Eades, on behalf of their son Camron Hernandez ("Hernandez"), along with Colton Hawkins ("Hawkins"), (collectively "Plaintiffs"), initially filed suit on April 16, 2018, against Aethon Energy Services, L.L.C. ("Energy"), the operator of record for a certain gas well in DeSoto Parish ("DeSoto well"), for the wrongful death of Hernandez and personal injury of Hawkins arising from an accident on April 18, 2017, at the DeSoto well when a steel hydrocarbon storage tank ignited and exploded while being dismantled by employees of United States Field Services, LLC ("USFS"). An amended petition was filed on May 2, 2019, to add Aethon Field Services, L.L.C. ("Field") as a defendant, a second amended petition was filed on December 23, 2019, to add G&D Well Service ("G&D") as a defendant, and a third amended petition was filed on May 13, 2020, to add Federal Insurance Company ("Federal"), the liability policy insuring Field, Axis Surplus Insurance Company ("Axis"), the excess liability policy insuring Field, and Travelers Indemnity Company ("Travelers"), the liability policy insuring G&D, as defendants.

Energy filed a motion for summary judgment on January 13, 2019, and a hearing was held on March 26, 2019. Plaintiffs requested leave on oral motion during the hearing to amend their petition to add Field as a defendant. Summary judgment was granted by the trial court, finding that Energy had no duty to Plaintiffs per the contract with USFS, and that Energy qualified as a statutory employer of the USFS employees on the job pursuant to La. R.S. 23:1061A(2), including Hernandez and Hawkins, whereby Energy was granted the exclusive remedy protections of La. R.S. 23:1032 and liable to pay any compensation under the applicable workers'

compensation provisions. The trial court limited its ruling to Energy, granting Plaintiffs' request to add Field as a defendant.

Field filed an initial motion for summary judgment on November 20, 2019, and an amended motion on November 16, 2021. A hearing was held on February 2, 2022, in which the trial court denied Field's motions, finding genuine issues of material fact as to Plaintiffs' claims in general. Field sought and was granted supervisory review.

For the following reasons, the ruling of the trial court is AFFIRMED.

**FACTS AND PROCEDURAL HISTORY**

*Business Structure*

On April 16, 2015, Energy created the subsidiary, Field, a limited liability company, of which Energy is the sole member. Preston Phillips, vice president of Aethon United, the current owner of the DeSoto well, Energy, and Field, stated in an affidavit that Field's sole purpose as a subsidiary of Energy is to serve as a separate legal entity to provide wages, salaries, and fringe benefits to individuals whose job duties consist solely of providing work and services for Energy's oil and gas business. Numerous employment contracts are entered into by and between Field as the employer and its employees, and payroll checks and W-2 forms are issued in Field's name. Field employs both labor and supervisory level employees. However, Field does not own any tools or equipment, and the account used for payroll processing is owned by Energy.

On June 20, 2015, Energy executed a "Contract Operating Agreement" with the then well owner that named Energy as the designated operator of record for the DeSoto well and site, to be listed as such with all regulatory agencies, and that specified that all contracts regarding the

operations of the well and the site would be executed by Energy, including those executed with third-party subcontractors. Since July 1, 2015, Energy has been listed with the Louisiana Department of Conservation as the registered operator of the DeSoto well and all equipment at the site. The permit to drill for minerals dated September 30, 2015, granted by the State of Louisiana Office of Conservation, lists Energy as the operator.

On July 15, 2016, the well owner company merged with several other companies to become Aethon United, and the ownership of the DeSoto well is maintained in the name of Aethon United, including the rights and obligations under the Energy operating agreement.

*Dismantlement Contractual Arrangements*

On April 3, 2017, the steel hydrocarbon storage tank at the DeSoto well was struck by lightning, which caused the contents to ignite, resulting in extensive damage to the tank. Energy opted to subcontract the dismantlement to other companies experienced in working with dangerous chemicals and equipment since the tank had contained hydrocarbons.

On April 4, 2017, Barry Stem, co-owner and general manager of USFS, an environmental decontamination company, sent a "Proposal" to "Aethon Energy" addressed to Thad Lowe ("Lowe"), an employee of Field, for USFS to "remove, decontaminate, transport, and dispose of a steel tank, a fiberglass tank, and catwalks" for the quoted amount of $6,026. The USFS Proposal required that Energy provide unimpeded access to the location, remove "all free liquids" from the tank prior to USFS arriving on site, and remove the tanks and debris from the containment area.

3

On April 10, 2017, a "Master Service Agreement" was executed by and between Energy "and its affiliates" as the "Company" and USFS as the "Contractor" which stated, in pertinent part, that:

Relationship of Parties:

All Contractor Services shall be performed by Contractor as an independent contractor and under the sole supervision, management, and control of Contractor in accordance with the specifications provided to Contractor by Company. Company shall look to Contractor for results only and shall have no right at any time to direct or supervise Contractor or its servants or employees in the performance of such work or as to the manner, means, and method in which work or labor is performed. The detailed manner and method of performing the Contractor Services shall be under the control of Contractor.

Standard of Performance:

Contractor shall perform all Contractor Services in good faith, in a good and workmanlike manner, with due diligence and dispatch. In accordance with good practice in the oilfield service industry, and in compliance with all applicable laws, rules, regulations, and orders of any governmental authority having jurisdiction.

Energy contracted with Key Energy Services, Inc. to drain the free liquids from the tank, and G&D to move the damaged tank from its containment area to an area that would allow for the tank to be dismantled, all of which was completed prior to April 18, 2017.

***Accident and Reporting***

On April 18, 2017, USFS co-owner Drake Williams, and USFS employees, including Hernandez and Hawkins, arrived at the DeSoto well to dismantle the tank. Williams tested the tank with a "sniffer" for remaining hydrocarbons and got a negative reading. The USFS employees then rolled the 15-foot tall tank to a grassy area. Hernandez and Hawkins were standing near the top of the tank, where it rested on its side. Another USFS employee began the dismantlement by using a hot cutting torch near the bottom of the

4

tank.  A flash fire ignited soon thereafter and the resulting explosion blew the lid off the tank.  Hernandez was struck by the tank lid and later died of his injuries.  Hawkins suffered severe burns.

A "Hazardous Materials Incident Report" was completed by the Louisiana State Police on April 18, 2017, in which numerous references were made to "Aethon Energy" as the operator of the well.  On April 20, 2017, USFS produced an accident investigation report detailing the events before and after the explosion, which noted that USFS contacted Lowe "with Aethon Energy" to inform him that an accident had occurred.  On April 25, 2017, Michael Garner ("Garner"), "HSE Advisor for Aethon Energy Operating, L.L.C.," wrote a letter, on letterhead from "Aethon Energy," detailing the events that occurred that day when he was advised about the accident by "Aethon Energy employee Mike Murray."  Garner then called his supervisor, Stephanie Scruggs, to report the incident, pursuant to Aethon Emergency Procedures.  Garner also met with the inspector from the U.S. Occupational Safety and Health Administration ("OSHA") several times and, as requested, provided a copy of the invoice showing that "Aethon Energy" had the tank emptied and a copy of the Master Service Agreement between "Aethon Energy" and USFS.  Following its investigation, OSHA penalized USFS for violations.  Garner, Murray, and Scruggs are also employed by Field despite any references to their representative capacities with Energy.

***Plaintiffs' Suit***

Plaintiffs filed an original petition, as well as first, second, and third supplemental and amending petitions, in which they ultimately sued Energy, Field, G&D, Federal, Axis, and Travelers.  Plaintiffs alleged that Energy and

5

Field were both directly and vicariously liable in negligence for injuries suffered by Hernandez and Hawkins from the tank explosion.

Specifically, Plaintiffs alleged that Energy, Field, and G&D shared supervisory and safety responsibility for the work performed in relation to the dismantlement project at the DeSoto well. Plaintiffs asserted that because these defendants knew the tank previously contained combustible or flammable hydrocarbons, they were responsible for ensuring that the tank was properly inspected, cleaned, vented, and safe for dismantling with a hot cutting tool; assessing potential hazards; and applying safety procedures to prevent explosions and fires. Plaintiffs maintained that USFS was not hired to clean the tank prior to dismantlement, and that USFS employees were told that the tank had already been cleaned.

### Energy's Motion for Summary Judgment

After answering the suit, Energy moved for summary judgment, asserting that it did not breach any duty that caused Hernandez's and Hawkins' injuries, and that any relief Energy owed to the Plaintiffs was restricted to workers' compensation because Energy had immunity from tort claims as a statutory employer.

In support of its claims, Energy referred to the April 4, 2017, USFS Proposal. Energy noted that it completed the tasks assigned to it in the Proposal, including specifically the removal of "free liquids" by draining the tank, and that there was no requirement that Energy clean the tank so thoroughly as to remove all traces of hydrocarbon. Energy also noted that, pursuant to the Master Service Agreement between Energy and USFS, USFS would perform all services as an independent contractor without Energy having any supervisory authority or obligations. Additionally, Energy

asserted the affirmative defense that, given its contractual relationship to USFS under the Master Service Agreement, it qualified as a statutory employer of USFS employees under La. R.S. 23:1061; and as a statutory employer, Energy and its employees had immunity from tort liability as to the Plaintiffs' claims, pursuant to La. R.S. 23:1032.

At the March 26, 2019, motion hearing, the Plaintiffs moved to amend their petition to add Field as a defendant. Energy objected to the amended petition, arguing that Field was only a "payroll company" for Energy. The trial court noted its observation that Plaintiffs' proposed amended petition alleged that only "Aethon Energy" was the operator of the well, and that Energy admitted in open court that it was the well operator. Nevertheless, the trial court allowed the Plaintiffs' amendment to include Field, stating:

> While judicial efficiency would suggest that the amendment should be allowed and this subsequent ruling on the defendant's Motion for Summary Judgment apply to both defendants, as there does not appear to be any basis for liability for Aethon Field Services independent of Aethon Energy Operating, the more prudent course of action would be to limit this ruling to Aethon Energy Operating, LLC. Accordingly, plaintiffs are granted leave to amend their petition, but this ruling is limited to Aethon Energy, LLC.

The trial court ultimately granted Energy's motion for summary judgment and dismissed Energy from the suit with prejudice, detailing its finding it in its written reasons filed May 29, 2019.

The trial court found that removal of the damaged storage tank was a task contemplated by the operating contract between Energy, as operator of record, and Aethon United, as well owner, because Energy was responsible for all field-related operations as well as compliance with all health, safety, and environmental regulations. It determined that removal of the tank was

7

clearly Energy's responsibility, which it transferred by contracting with USFS for the tank's removal.

Further, the trial court held that the contract between Energy and USFS clearly provides that "Aethon would remove the free liquids only before turning over the dismantling operation to USFS" and "Aethon Energy Operating had no authority to control the means and methods of USFS's work, or supervise its employees." The court found that "the claimed duty which plaintiffs argue should be imposed upon Aethon Energy Operating to properly clean the tank and have a safety meeting is in contravention of the rights and obligations as between Aethon Energy Operating and USFS." Impliedly, the court determined that the phrase "removal of free liquids" did not equate to any thorough cleaning of the tank.

The trial court further ruled that under La. R.S. 23:1061A(2), Energy qualified as a statutory employer for the USFS employees working on the dismantlement project; therefore, Energy is granted the exclusive remedy protections of La. R.S. 23:1032 and liable to pay any compensation under the workers' compensation provisions.

Plaintiffs did not seek an appeal or supervisory review of the summary judgment; however, the judgment was never certified as final by the trial court.

***Field's Motion for Summary Judgment***

In their first supplemental and amended petition, Plaintiffs raised the same claims of direct and vicarious liability against Field, who also moved for summary judgment. Field asserted that it was only a "payroll company," whose sole purpose was to provide salaries, wages, and benefits for employees who performed work solely for Energy. Field further argued that

it was not directly liable because it was not the operator for the DeSoto well, it did not contract with USFS, Key Energy, or G&D regarding the dismantlement project, and it performed no activities regarding the well other than handling the hiring, payroll, and benefits of the individuals who performed the well operations for Energy.

Field argued that it was not vicariously liable because all Field employees were also "borrowed employees" of Energy, and thus were "cloaked with the co-employee tort immunity" that all Energy employees enjoy as to the Plaintiffs' claims, per the trial court's ruling that Energy is a statutory employer of the USFS employees.

In an amended motion for summary judgment, Field asserted an alternative defense that if the trial court concluded that Field was an operator for the well site, as alleged by Plaintiffs, then Field would qualify as a statutory employer with immunity to Plaintiffs' tort claims, and Plaintiffs' relief would be restricted to workers' compensation.

A hearing on Field's motion and amended motion were held on February 2, 2022.  At the conclusion of the hearing, without any additional reasons, the trial court held:

> Based on what has been presented to the Court, both through the briefing and the argument today, the Court is inclined to deny the motion for summary judgment, believing that there are genuine issues of material fact, and as those have been articulated by the plaintiffs.

On February 8, 2022, the trial court signed the written judgment denying Field's motions for summary judgment.  Field sought supervisory review of that ruling.  On May 19, 2022, this Court granted the application for supervisory writs filed by Field.

9

## DISCUSSION

The trial court denied Field's motion for summary judgment, finding genuine issues of material fact "as those have been articulated by the plaintiffs" "to the Court, both through the briefing and the argument." This Court looks specifically to Plaintiffs' oppositions to Field's motion and amended motion for summary judgment and the summary judgment hearing transcript in order to ascertain Plaintiffs' assertions of genuine issues of material fact relied upon by the trial court in its denial of Field's motion.

### *Borrowed Employee Status/Vicarious Liability*

Field argues that the trial court erred in denying its motion for summary judgment because there were no genuine issues of material fact as to whether the Field employees were considered "borrowed employees" of Energy, such that Field and its employees would be vicariously entitled to share in the tort immunity afforded to Energy as a statutory employer of the USFS employees working on the dismantlement project.

Field claims that as borrowed employees of Energy, it has no vicarious liability under La. R.S. 23:1031 and La. R.S. 23:1032. La. R.S. 23:1032 provides in part:

> This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principle or any officer, director, stockholder, partner or employee of any such employer or principal under any dual capacity theory of doctrine.

Due to Energy's qualification as the statutory employer of the USFS employees, Energy and its employees are immune from tort liability as to the USFS employees' claims. Therefore, any borrowed employees of Energy would receive the same immunity as Energy and its own employees from tort liability, particularly as to the USFS's employees' claims.

10

Field further claims that, as employees of Energy, either directly or as borrowed servants, Field employees are also entitled to co-employee tort immunity from any claims by the statutory employees of Energy, the Plaintiffs.  In support of its argument, Field cites *Stovall v. Shell Oil Co.*, 577 So. 2d 732 (La. App. 1 Cir 1991), *writ denied,* 582 So. 2d 1309 (La. 1991), in which the First Circuit held that a borrowed servant of a statutory employer has co-employee tort immunity to the statutory employee.

Both Field and the Plaintiffs refer to the holding in *Rogers v. Louisiana Department of Corrections,* 43,000 (La. App. 2 Cir. 4/30/08), 982 So. 2d 252, *writ denied*, 08-1178 (La. 9/19/08), 992 So. 2d 931, regarding whether the Field employees are considered the borrowed employees of Energy.  In *Rogers*, this Court found as follows:

> In order to determine whether a worker is the borrowed employee of another, the necessary questions to be asked are:
>
> 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> 2. Whose work is being performed?
> 3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> 4. Did the employee acquiesce in the new work situation?
> 5. Did the original employer terminate his relationship with the employee?
> 6. Who furnished the tools and place for performance?
> 7. Was the new employment over a considerable length of time?
> 8. Who had the right to discharge the employee?
> 9. Who had the obligation to pay the employee?

The parties each argue the borrowed servant determining factors at length in support of their respective positions.

While no single factor is determinative, the control element is considered to be the most important.  *LeCroy v. Interim Health Care Staffing of North Louisiana, Inc.*, 43-080 (La. App. 2 Cir. 4/2/08), 980 So. 2d 838. The control factor addresses who directly supervises the employee while the

11

work is being performed. *Garrett v. Adcock Construction Co.*, 13-0104 (La. App. 4 Cir. 8/14/13), 122 So. 3d 1134.

In summary, Field urges that Energy, as the contractual operator of record, has the exclusive control of all activities by Field personnel at the DeSoto well. Energy officers develop plans and strategies for each well site facility, Energy provides Field personnel with the work locations and all tools and equipment they need in order to perform their duties for Energy, and Field employees regularly hold themselves out to others as working for and on behalf of Energy. Although Field is the employer of those employees that perform work for Energy by way of executed employment contracts, Energy also has the right to terminate Field employees.

Field further urges that the corporate structure itself is a strong indication that Energy has the requisite control over Field in order to classify the Field employees as borrowed employees of Energy. Field is a wholly owned subsidiary of Energy, completely managed by its sole member pursuant to the LLC Operating Agreement. Field has no assets of its own, nor any funds to buy the tools, equipment, or trucks used by the Field employees in their work for Energy. Energy owns and funds the bank account used by Field to process payroll. The Field employees perform work solely for Energy on a daily basis.

The Plaintiffs primarily argue that Field maintained control and supervision of its employees because Field employed both labor and supervisory levels of personnel. All the employees that managed the DeSoto well, such as the roles of District Foreman, Production Foreman, Lead Operator, Head of Safety, and HSE Advisor, were all employed by Field. The Field employees negotiated the terms of the agreement with USFS and

12

were the ones involved in handling the aftermath of the explosion. No evidence was presented that any Energy employees had a direct supervisory role over the personnel involved in the DeSoto well's regular, daily operations. Also, the employment contracts executed by the Field employees state that Field is their employer, provide that training will be provided by Field, indicate that Field has the right to terminate employment, and designate the specific individual the contracting employee is to report to – in all employment contracts offered into evidence, the supervisor also being a Field employee.

The Plaintiffs strongly assert that Field's status as a wholly owned subsidiary of Energy is irrelevant to the determination of whether Energy exerted the requisite control over Field or whether it vicariously receives the tort immunity of its parent company. It refers to the Louisiana Supreme Court's holding in *Smith v. Cotton's Fleet Service, Inc.*, 500 So. 2d 759 (La. 1987), that rejected a defendant's attempt to "merge itself with its parent, make the parent the actual employer of the plaintiff, and thereby immunize itself and the parent from plaintiff's tort claim." The Court proceeded to state that the defendant's argument "attacks a basic policy decision of the legislature that is generally favorable to corporate investors and which defendant without a doubt would have defended strongly had this been a tort suit by a third person seeking to pierce the corporate entities." *Id.*

It is well settled that tort immunity under the borrowed employee doctrine is an affirmative defense. *Billeaud v. Poledore*, 603 So. 2d 754 (La. App. 1 Cir. 1992), *writ denied*, 608 So. 2d 176 (1992). The party seeking to claim the status of a borrowing employer bears the burden of proof on this issue. *Id.* Courts have recognized that the question of borrowed employee

13

status is inherently factual and should typically be decided by the jury. *Id.* Because immunity based on the borrowed employee doctrine is in derogation of the general tort rights of victims, the scope of immunity must be strictly construed. *Sewell v. Doctors Hospital*, 600 So. 2d 577 (La. 1992).

### *Direct Negligence*

Field argues that the trial court erred in denying its motion for summary judgment by finding genuine issues of material fact as to whether Field was directly negligent in causing the subject accident.

Field claims it had no direct liability because it had no ownership or contractual interest in the DeSoto well, which is owned by Aethon United and operated by Energy. Energy was the contractual operator of the well who assigned and managed all tasks and activities of the DeSoto well. Energy was also the contracting party for the dismantlement project who hired USFS, Key Energy or G&D.

The Plaintiffs rely on the testimony of their expert witness, Gregg Perkin ("Perkin"), a professional engineer offered as an expert in oilfield operations and safety, who opined that since it was actually the Field employees who were executing the daily operations of the DeSoto well for the dismantlement project, they essentially acted as an "operator" of the specific tasks involved in the project. Perkin defined the "operator of a well" as follows:

> An operator of a well can be many different definitions. An operator can be an owner, an operator can be a partial owner of the well. An owner – an operator is going to call the shots relative to how they're going to produce this well, how they're going to repair this well, how they're going to abandon this well, how they're going to modify this well. Those are all the duties and responsibilities of an operator. The operator's responsible to the state, or the, you know, the authorities for operating their well

safely and doing the right things, not to injure people, pollute the environment, that sort of thing.

In Perkin's opinion, Field employees "controlled the details of the operations of this well and the maintenance of this well and the repairs of these wells," and were the individuals who were at the well each workday performing the daily tasks necessary for the well's operation; therefore, in his opinion, Field was the well operator, even if the activities were being performed on behalf of Energy. Therefore, Field assumed certain responsibilities as the operator "by default" despite not being the contractual operator of record for regulatory purposes.

Field also argues that the Master Service Agreement expressly states that USFS was an independent contractor and neither Energy nor Field, as an affiliate of Energy, exercised any control or supervision over the USFS employees for the tank dismantling project. It urges that, as specifically provided in the agreement, there was no duty imposed on Energy or Field to do anything beyond removing "free liquids" from the tank, or to ensure that safety protocols were set and followed in dismantling the tank. The trial court found that Energy owed no duty to remove all traces of hydrocarbons and enforce safety procedures for the dismantling of the tank, and to hold otherwise would be in contravention of the rights and obligations pursuant to the agreement between Energy and USFS. Field claims that there is no evidence it had any duty separate from or in addition to that which was not imposed upon Energy by the trial court.

Plaintiffs continue to rely on Perkin's testimony to assert that Field violated federal regulations, industry-standard protocols, and its own safety policies and procedures. In Perkin's opinion, the USFS Proposal specifying

15

that Energy was responsible for draining the free liquid from the tank actually meant that Energy was responsible for cleaning the tank and removing all traces of hydrocarbons from the tank because there is no way to remove all the free liquids without a proper cleaning of the tank.

Plaintiffs claim that the evidence proves that Field was directly negligent in causing the explosion because employees of Field, not Energy, coordinated the tank removal project and communicated directly with USFS regarding the scope of their work. USFS witnesses testified that, based on their discussions with Field personnel, they understood that the tank was cleaned and prepared for cutting when they arrived and that their scope of work was limited to cutting the tank, NORM ("naturally occurring radioactive material") decontamination, and hauling it away. In addition, USFS representatives testified that it should have been clear just from the quoted amount of the dismantlement project Proposal that the scope of work did not include the cleaning that would be necessary prior to commencement of any hot work.

Plaintiffs also claim, based on Perkin's testimony, that Field did not sufficiently remove the liquid hydrocarbons from the tank because it used a vacuum truck method. At minimum, this method would have left vapors that ignited and caused the explosion, but it is also quite possible that standing liquids were not adequately removed because of the size and shape of the tank, how it would have been vacuumed, and inadequacies of the "sniffer" to check for flammable content.

Plaintiffs further contend that Energy and Field had the primary responsibility to ensure that certain safety standards were met. As the operator of record for regulatory purposes, Field, due to its employees'

involvement in the management of the DeSoto well, had a duty to clearly communicate the expectations, roles, and responsibilities of the various parties that it involved in the tank decommissioning project. Plaintiffs assert that at best, there was confusion concerning the scope of USFS's work, which is evidence of negligence by Field, which owed the responsibility to ensure that all parties were well apprised of their respective roles and responsibilities as it related to the dismantlement project.

### *Reasoning*

A ruling regarding a motion for summary judgment is reviewed *de novo,* using the same criteria that govern the district court's consideration of whether a summary judgment should be granted: whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Smith v. Robinson*, 18-0728 (La. 12/5/18), 265 So. 3d 740; *Franklin v. Dick*, 51,479 (La. App. 2 Cir. 6/21/17), 224 So. 3d 1130.

Summary judgment is favored and will be granted if the evidence is sufficient to show that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. La. C.C.P. art. 966; *Bank of America, N.A. v. Green*, 52,044 (La. App. 2 Cir. 5/23/18), 249 So. 3d 219.

A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. *Jackson v. City of New Orleans*, 12-2742 (La. 1/28/14), 144 So. 3d 876, *cert. denied*, 574 U.S. 869, 135 S. Ct. 197, 190 L. Ed. 2d 130 (2014). A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate.

*Champagne v. Ward*, 03-3211 (La. 1/19/05), 893 So. 2d 773; *Bloxham v. HDI-Gerling American Insurance Co.,* 52,177 (La. App. 2 Cir. 6/27/18), 251 So. 3d 601. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. *Chanler v. Jamestown Insurance Co.*, 51,320 (La. App. 2 Cir. 5/17/17), 223 So. 3d 614, *writ denied*, 17-01251 (La. 10/27/17), 228 So. 3d 1230.

The burden of proof remains with the movant. La. C.C.P. art. 966(D). However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. *Id.* If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. *Bufkin v. Felipe's Louisiana, LLC*, 14-0288 (La. 10/15/14), 171 So. 3d 851; *Schultz v. Guoth*, 10-0343 (La. 1/19/11), 57 So. 3d 1002. The court determines whether there is a genuine issue of triable fact, with all doubts resolved in favor of the non-moving party. *Larson v. XYZ Ins. Co.,* 16-0745 (La. 5/3/17), 226 So. 3d 412.

Field, as both the movant under summary judgment and as the party seeking to claim the status of borrowing employer, bears the burden of proof as to whether Field's employees qualify as the borrowed employees of Energy such that they may receive tort immunity. This Court finds that Field has not met such burden and genuine issues of material fact exist as to this particular issue. We recognize the reasoning in *Billeaud v. Poledore*,

18

*supra*, that the question of borrowed employee status is inherently factual and should typically be decided by the jury. This is such a case. Both parties have presented arguments that give rise to legitimate questions as to whether Energy or Field had control over the actions of the employees involved in the dismantlement project pursuant to the borrowed servant doctrine, not all of which may be appropriately disposed of by summary judgment.

Further, the testimony of expert witness, Gregg Perkin, brings to light several issues as to the direct liability of the Field employees, including but not limited to, inadequate management of the project, failure to properly communicate and supervise, failure to follow required safety protocols and procedures, and failure to comply with the terms of the USFS agreement by draining the free liquids (which would encompass an issue of material fact in and of itself as an ambiguous term of the contract). Therefore, we find there are genuine issues of material fact as to whether Field was directly negligent in causing the accident and agree with the trial court's denial of Field's motion for summary judgment as to this issue.

## CONCLUSION

For the foregoing reasons, this Court finds that there are genuine issues of material fact as to both the issues of: (1) whether Field employees were borrowed employees of Energy, such that Field and its employees vicariously receive Energy's tort immunity; and (2) whether Field was directly negligent. We hereby affirm the trial court's denial of Field's motion for summary judgment. All costs of this proceeding are to be paid by Field.

**AFFIRMED.**

19